732

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 12 CR 691
                                   :
                                   :
                                   :
        -against-                  : UNITED STATES COURTHOUSE
                                   : BROOKLYN, NEW YORK
                                   :
                                   :
                                   : JANUARY 10, 2014
JOSEPH ROMANO,                     : 10:00 O'CLOCK A.M.
                                   :
        Defendant.                 :

- - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOHN F. KEENAN
SITTING BY DESIGNATION
UNITED STATES SENIOR JUDGE, and a jury.

A P P E A R A N C E S:

For the Government: WILLIAM J. HOCHUL, JR.
                    United States Attorney
                    Western District of New York
                    138 Delaware Avenue
                    Buffalo, New York 14202
                    BY:  MARSHALL MILLER
                         UNA DEAN
                         Assistant United States Attorneys

For the Defendant:  GEORGE GOLTZER, ESQ.
                    200 West 57th Street, Suite 900
                    New York, New York 10019

                    MICHAEL BACHRACH, ESQ.
                    276 Fifth Avenue, Suite 501
                    New York, New York 10001

Court Reporter:     SHERRY J. BRYANT, RMR, CRR
                    225 Cadman Plaza East
                    Brooklyn, New York 11201
                    sbryant102@verizon.net
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

WILLIAM HESSLE-DIRECT-DEAN                    733

1          (Jury enters.)

2          THE COURT:  Good morning, everybody.  All right.

3    Resume direct examination as soon as the witness gets here.

4          MS. DEAN:  William Hessle, Your Honor.

5          (William Hessle resumes the witness stand.)

6          THE COURT:  Good morning, Mr. Hessle.

7          THE WITNESS:  Good morning, Your Honor.

8          THE COURT:  You may proceed.

9          MS. DEAN:  Thank you, Your Honor.  May I approach

10   the witness?

11         THE COURT:  Yes, you may.

12   CONTINUED DIRECT EXAMINATION

13   BY MS. DEAN:

14   Q    Mr. Hessle, yesterday you testified and explained what a

15   PIN number is, a personal identification number.  I'm showing

16   you what's been admitted as Government Exhibit 300.  How many

17   numbers does a PIN number have, the PIN numbers used at the

18   Nassau County Jail?

19   A    Let me count them.  I'm counting them.  One second.  It's

20   like 11.

21   Q    And can you explain how an inmate makes a telephone call

22   from the Nassau County Jail, generally?

23   A    Yes.  It's my understanding that when they make the --

24   they place a call from the jail, they have to include the PIN

25   number of the inmate that is actually making the call.

1  Q    And type in all those digits?

2  A    Yes, I believe so.

3  Q    May we have the ELMO?

4       Now, I'm showing you what's been marked for

5  identification Government Exhibit -- Your Honor, I don't

6  believe there's an objection to this exhibit.  Is it okay to

7  publish it?

8       MR. GOLTZER:  Yes, no objection.

9       THE COURT:  The exhibit then is received in

10  evidence, 300A.

11       MS. DEAN:  Thank you, Your Honor.

12       (Exhibit published to the jury.)

13  Q    Up on the ELMO is what has now been admitted at

14  Government Exhibit 300A as well as a document marked

15  Government Exhibit 300AT.  What are these exhibits?

16  A    300A is a telephone recording that was made on August

17  14th, 2011, at 2 p.m., and a conversation between the

18  defendant and Dejvid Mirkovic.

19  Q    And was this telephone call made on the defendant's own

20  PIN number?

21  A    No, it was not.

22  Q    Whose PIN number was used to make this call?

23  A    I believe it was Bobby Brown's.

24  Q    An inmate at the Nassau County Jail at the time?

25  A    Yes, that is correct.

WILLIAM HESSLE-DIRECT-DEAN                          735

1   Q    And did you have an opportunity to review 300 and 300AT

2   prior to today?

3   A    Yes, I did.

4   Q    And is 300AT a fair and accurate transcription of 300A?

5   A    Yes.

6   Q    And these are your initials here on 300AT?

7   A    Yes, they are.

8              THE COURT:  You can use the microphone.

9              MS. DEAN:  I have a microphone on me, Your Honor.

10  Is it not clear?

11             THE COURT:  Well, it's easier if you use a

12  microphone.

13             MS. DEAN:  Your Honor, at this time, we would like

14  to play excerpts from Government Exhibit 300A, and I would

15  direct the jurors to tab 300 in their binders.

16             THE COURT:  300.  Again, if you use the transcript,

17  that's only an aid.  What you hear on the recording is the

18  evidence, not what is in the transcript.

19             Do you know, Mr. Hessle, who the participants are in

20  300A?

21  A    Yes, Your Honor.

22             THE COURT:  Who are they?

23  A    They are the defendant and an individual named Dejvid

24  Mirkovic.

25             THE COURT:  Thank you.  Go ahead.

WILLIAM HESSLE-DIRECT-DEAN                                736

1              MS. DEAN:  Can we pause for a minute?

2     Q    And, Mr. Hessle, you said that you listened to this

3     conversation prior to today.  What topics are discussed during

4     this conversation?

5     A    The defendant's discussing the conditions at the Nassau

6     County Correctional Center.

7              MS. DEAN:  And at this time, I'd like to play

8     excerpts.

9              THE COURT:  You may play 300A.

10             (Tape-recording played.)

11             MS. DEAN:  And then a second excerpt.

12             (Tape-recording played.)

13    Q    Now, Mr. Hessle, you spoke about the defendant's use of

14    other inmates' PIN numbers.  How did you discover that the

15    defendant was using other inmates' PIN numbers to make

16    telephone calls?

17             MR. GOLTZER:  Objection; repetitive.

18             THE COURT:  Overruled.

19    A    During the course of reviewing the jail conversations,

20    there were conversations in which the defendant was directing

21    Dejvid Mirkovic to place funds onto the commissary accounts of

22    other inmates.

23    Q    And when you first requested the defendant's telephone

24    calls from the Nassau Jail, what specifically did you request?

25    A    At the time, I requested the calls that were made using

WILLIAM HESSLE-DIRECT-DEAN                     737

1    exclusively the defendant's PIN number.

2    Q    And did you listen to those calls?

3    A    I did.

4    Q    And did you notice anything unusual while listening to

5    those calls?

6    A    Yes.  What I noticed is that there were references being

7    made to prior conversations in which I could find no record of

8    being listed on the detailed report that I had.

9    Q    And so what did you do then?

10   A    It was then that I requisitioned from the Nassau County

11   Correctional Center what's called a reverse search.  In a

12   reverse search, I had the phone number of Mr. Mirkovic given

13   to the Nassau County Correctional Center and had them search

14   their computer file, their computerized telephone file of

15   everyone within the -- every inmate within the center who had

16   placed a call to Mr. Mirkovic's number.

17   Q    And what did you receive in response to that request?

18   A    I received a detailed report, itemizing, listing all the

19   calls that had been placed between a certain time frame,

20   August and September of 2012.

21   Q    And how many other inmates' PINs did the defendant use

22   while at the Nassau Jail?

23   A    Thirty-four.

24   Q    Over what span of time?

25   A    The first one was identified in June of 2011, right

WILLIAM HESSLE–DIRECT–DEAN                    738

1    through September 28th of 2012.

2    Q    Are inmates allowed to have cell phones in jail?

3    A    No, they're not.

4    Q    And did you receive telephone calls that the defendant

5    placed back in August of 2011?

6    A    I'm sorry?

7    Q    Back in August of 2011.

8    A    Yes.

9    Q    And whose PIN did the defendant use to place those calls?

10   A    I'm not quite sure I understand.

11   Q    In August of 2011, you listened to telephone calls that

12   the defendant made from the Nassau Jail?

13   A    Yes.

14   Q    And did he place those calls using his own PIN number?

15   A    No, he did not.

16   Q    Whose PIN number did he use during that time period?

17   A    In 2011, he was -- I believe he was using --

18   Q    If I --

19   A    I need to refresh my recollection.

20   Q    Well, I'll show you what was just up on the ELMO,

21   Government Exhibit 300AT.  This was a call made by the

22   defendant in August of 2011.  Whose PIN number was used to

23   make that call?

24   A    That was Bobby Brown.

25   Q    Now, showing you what's been marked for identification as

WILLIAM HESSLE-DIRECT-DEAN                    739

1    Government Exhibit 99, do you recognize this document?

2    A    I do.

3    Q    What is it?

4    A    This is a chart depicting phone calls made from the

5    defendant to Mr. Mirkovic, the time frame August 1st, 2012 to

6    September 28th, 2012.

7    Q    And how was this chart prepared?

8    A    These calls were taken from the reverse report that was

9    provided to me by the Nassau County Correctional Center.

10           MS. DEAN:  Your Honor, at this time, the government

11   offers Government Exhibit 99.

12           MR. GOLTZER:  No objection.

13           THE COURT:  Received.

14           MS. DEAN:  May we publish?

15           THE COURT:  You may.

16           (Exhibit published to the jury.)

17   Q    Now, just to be clear, does this chart reflect calls that

18   were placed but did not actually connect?

19   A    Yes, it does.

20   Q    And it also includes calls that connected?

21   A    Yes.

22   Q    Now, just to point out a number of things on this chart,

23   how many times did the defendant call Dejvid Mirkovic, using

24   Inmate Cabrejal's PIN number?

25   A    182 times.

WILLIAM HESSLE–DIRECT–DEAN                    740

1    Q    And Inmate Hawxhurst?

2    A    Forty-six times.

3    Q    And Inmate Moran?

4    A    Thirty-nine times.

5    Q    How many times did the defendant call Dejvid Mirkovic

6    during this time period using his own PIN number?

7    A    None.

8    Q    And during this time period between August 1st, 2012 to

9    September 28th, 2012, how many times in total did the

10   defendant call Dejvid Mirkovic?

11   A    273.

12   Q    And how many calls, on average, is that a day?

13   A    It's about between four and five.

14   Q    Now, when you listened to the telephone calls that the

15   defendant made to Dejvid Mirkovic, did you hear any calls

16   referencing the murder plot?

17   A    Yes, I did.

18   Q    So those calls were all made using other inmates' PIN

19   numbers?

20   A    That is correct.

21   Q    Now, you said all of these telephone calls were made to

22   Mirkovic at Mirkovic's telephone number ending in 6662?

23   A    Yes.

24   Q    Did Mirkovic have another telephone number?

25   A    Yes, he did.

WILLIAM HESSLE-DIRECT-DEAN                741

1  Q     And what were the last four digits of that telephone

2  number?

3  A     It was a Florida cell phone number with the -- ending in

4  9905.

5          MS. DEAN:  Your Honor, at this time, the government

6  would like to read a fact stipulation.

7          THE COURT:  You may read it.  It's now evidence as

8  soon as you've read it.  Go ahead.

9          MS. DEAN:  It is hereby stipulated and agreed by and

10 between the United States of America and the defendant Joseph

11 Romano, by his attorneys, that Government Exhibit 96 is a true

12 and accurate copy of call detail records, subscriber

13 information and billing records for the telephone number

14 561-307-9905 subscribed to by Dejvid Mirkovic, 7090 Via

15 Leonardo, Lake Worth, Florida 33467, contact home e-mail

16 dejvidmirkovic@yahoo.com, for the period of January 1, 2012 to

17 October 31, 2012.

18          Government Exhibit 97 is a true and accurate copy of

19 call detail records, subscriber information and billing

20 records for the telephone number 516-749-6662, subscribed to

21 by Dejvid Mirkovic, 45 South Merrick Road, Massapequa, New

22 York 11758, subscriber contact number 561-307-9905, e-mail

23 dejvidmirkovic@yahoo.com, for the period January 1, 2012

24 through November 28, 2012.

25          Government Exhibit 98 is a true and accurate copy of

WILLIAM HESSLE-DIRECT-DEAN                    742

1    subscriber information and billing records for the telephone

2    number 516-949-9670 subscribed to by Karen Romano, 22 Lilac

3    Lane, Levittown, New York 11756, for the period January 1,

4    2012 through October 31, 2012.

5              This stipulation marked Government Exhibit 95 and

6    Government Exhibits 96 through 98 are admissible in evidence

7    at trial.  And, Your Honor, at this time the government would

8    also offer Government Exhibits 96 through 98.

9              MR. GOLTZER:  No objection.

10             THE COURT:  Received.

11   Q    Mr. Hessle, turning your attention to Government Exhibit

12   96, what is this document?

13   A    That is the subscriber information provided by AT&T for

14   the telephone number 561-307-9905.

15   Q    Who was this telephone number subscribed to in September

16   and October 2012?

17   A    Dejvid Mirkovic, 7090 Via Leonardo, Lake Worth, Florida.

18   Q    Can you explain what the difference is between a prepaid

19   telephone and a postpaid telephone?

20   A    Yes.  A prepaid call -- a prepaid telephone requires that

21   the calls be funded prior -- excuse me, prior to using the

22   phone.  A postpaid phone is the traditional phone in which you

23   can make your calls and then you would be billed after you

24   make the calls.

25   Q    Is there a term, as a law enforcement agent, you use to

Case 1:12-cr-00691-DC    Document 164    Filed 03/10/14    Page 12 of 88 PageID #: 1281

WILLIAM HESSLE–DIRECT–DEAN                    743

1   refer to prepaid phones?

2   A    Yes.  The term -- there are several terms, but throwaway

3   phone is the -- probably the most common.

4   Q    Why do you call prepaid phones throwaway phones?

5   A    Because historically, after the phone is used for a

6   limited period of time, it's disposed of.

7   Q    Now, Government Exhibit 96, Dejvid Mirkovic's 9905

8   number, is this a prepaid telephone or a postpaid telephone?

9   A    It's a postpaid telephone.

10  Q    Now, turning your attention to Government Exhibit 97,

11  what is this document?

12  A    That is the subscriber information provided for telephone

13  number 516-749-6662.

14  Q    And who was this telephone subscribed to between August

15  and October 2012?

16  A    Dejvid Mirkovic.

17  Q    Now, it says here the address for Dejvid Mirkovic is

18  listed as 45 South Merrick Road, Massapequa, New York 11758.

19  Is that Dejvid Mirkovic's address, or was that Dejvid

20  Mirkovic's address?

21  A    No, it's not.

22  Q    Whose address is that?

23  A    That's the defendant's mother-in-law's address.

24  Q    Now, this 6662 telephone number, is this a prepaid

25  telephone or a postpaid telephone?

SB      OCR   RMR   CRR

WILLIAM HESSLE–DIRECT–DEAN                744

1    A    It's a prepaid.

2    Q    Now, the telephone calls that the defendant made to

3    Mirkovic from August to October 2012 in the Nassau Jail, what

4    telephone number did the defendant call?

5    A    The 662 number.

6    Q    The prepaid telephone?

7    A    That is correct.

8    Q    During this time period, were there any calls between the

9    defendant and Mirkovic at Mirkovic's 9905 postpaid telephone

10   number?

11   A    No, there were not.

12          MS. DEAN:  Your Honor, at this time the government

13   would like to read an offer, another fact stipulation,

14   Government Exhibit 40.

15          THE COURT:  You may do so.  I think, again, ladies

16   and gentlemen, that is evidence in the case once it's read.

17          MS. DEAN:  It is hereby stipulated and agreed by and

18   between the United States of America and the defendant Joseph

19   Romano, by his attorneys, that Government Exhibit 41A is a

20   letter dated March 18, 2012 that was handwritten by the

21   defendant, Joseph Romano.

22          Government Exhibit 41B is a letter dated June 13,

23   2012 that was handwritten by the defendant, Joseph Romano.

24          Government Exhibit 41C is a letter dated August 22,

25   2012 that was handwritten by the defendant, Joseph Romano.

WILLIAM HESSLE-DIRECT-DEAN                    745

1        Government Exhibit 41D is a letter dated September

2   3rd, 2012 that was handwritten by the defendant, Joseph

3   Romano.

4        Government Exhibit 41E is a letter dated September

5   28, 2012 that was handwritten by the defendant, Joseph Romano.

6        Government Exhibits 41A through E, 41A through 41E

7   and the stipulation marked Government Exhibit 40 are

8   admissible in evidence at trial.

9        Your Honor, at this time the government would also

10  offer Government Exhibits 41A through 41E.

11       MR. GOLTZER:  No objection.

12       THE COURT:  They're received.

13       MS. DEAN:  May we publish some of them to the jury?

14       (Exhibit published to the jury.)

15  Q    Now, showing you on the ELMO what's been admitted as

16  Government Exhibit 41A --

17       MS. DEAN:  Your Honor, at this time the government

18  would request an instruction with regard to the redactions in

19  these letters.

20       THE COURT:  All right.  There are certain things

21  that are not relevant that are taken out of the letter, 41A,

22  in what I'll call paragraph three.  You can see it up there on

23  the screen.  That has nothing to do with the case.  Don't

24  speculate as to what it is.  And both sides have agreed that

25  it should be redacted.

WILLIAM HESSLE-DIRECT-DEAN                746

1          MR. GOLTZER:  Yes.

2          MR. MARSHALL:  Yes, Your Honor.

3    Q    Mr. Hessle, did you review this letter prior to today?

4    A    I did.

5    Q    Can you read the first few paragraphs?

6    A    Paragraph one:  "My 212 number" --

7    Q    I'm sorry, can you start from the beginning.

8    A    "Dear Doggie, hope all is well."

9          MR. GOLTZER:  May we have a date?

10         THE COURT:  3/18/12.

11         MR. GOLTZER:  Thank you.

12         THE COURT:  It's on the exhibit up on the upper

13   right-hand corner.  March 18, 2012.  Go ahead.

14   A    "Hope all is well."  "Dear Doggie, hope all is well.  I

15   know that you're doing everything that you can to help me in

16   all my troubles, but there are still a few things which I

17   can't let go.  I want you to think about them and when the

18   time is right they need to be addressed.

19         Number 1:  My 212 phone number was lost for no

20   reason.  It should have been taken care of by you.

21         Number 2:  Two of my cars were stolen and that

22   should have never happened.  If my stuff was handled right, I

23   should have gotten those cars back immediately.  I would never

24   have let it -- I would never have let someone take advantage

25   of you the way I was exploited.

SB      OCR   RMR   CRR

WILLIAM HESSLE-DIRECT-DEAN                    747

1          Number 3:  My watch.  You should have been there to

2    make sure my shit was secure.

3          These are the things that bother me."

4    Q    Turning to page 2 of this document, can you keep reading.

5    A    "My cars will need to be replaced or taken back.  The

6    things that are not included in this list are stupid mistakes

7    like tenants stealing from me and/or destroying my property.

8    You need to take a hard stand against all these people.  I

9    would never allow people to do this to you or Megan or Mikey.

10   However, I don't want you" --

11         THE COURT:  I think it's "and Mikey" not "or Mikey."

12   Go ahead.

13   A    "However, I don't want you to think that you are not

14   doing a good job, no, you are, but I must be restored.  You

15   know I never lose at anything and my hands are tied right now,

16   but I want some of these things fixed.  Please know that I

17   appreciate all that you do.  I won't forget that.  Love Joe."

18   Q    Now, it starts here with the introduction "Dear Doggie."

19   Did you ever, in your review of the telephone calls made by

20   the defendant from jail, hear the defendant refer to anyone as

21   Doggie?

22   A    Yes, I did.

23   Q    To whom did he refer as Doggie?

24   A    Dejvid Mirkovic.

25   Q    Now, you said you also heard in the defendant's jail

1  calls him referencing cars being stolen from him.  Who did he

2  say had stolen his cars?

3  A    Nick at Millennium Custom Auto.

4  Q    Now, turning your attention to the second page, the first

5  full paragraph, the defendant references tenants stealing from

6  him and/or destroying his property.  In the course of your

7  investigation, did you note what properties the defendant

8  owned?

9  A    Yes, I did.

10  Q    Did he have any rental properties?

11  A    Yes, he did.

12  Q    How many are you aware of?

13  A    Three.

14  Q    In Florida?

15  A    Yes.

16  Q    Now, the defendant in this letter also references someone

17  named Megan and Mikey.  "I would never allow people to do this

18  to you or Megan and Mikey."  Who are Megan and Mikey?

19  A    Megan is Dejvid Mirkovic's wife, and Mikey is his son.

20  Q    Now, showing you what's been admitted as Government

21  Exhibit 41B, do you recognize this document?

22  A    I do.

23  Q    Did you review it prior to today?

24  A    I did.

25  Q    What is the date of this document?

1    A      It appears to be June 13, 2012.

2    Q      Can you start from the top and begin reading this letter?

3    And if you need me to zoom in, please let me know.

4    A      "Dear Dave, hope you're well.  I'm fine and thank you for

5    helping me to live as well as I can in the county jail.  I

6    know that handling my things can cause brain damage, and I

7    know the people I've dealt with are scoundrels.  I have been

8    living my life for such a long time and understand how

9    difficult it is.  Anyway, pursuant our last conversation, I

10   explained about Bluebird.  I want to switch the rims and the

11   tires on the car and replace with the originals.  I also need

12   the heater core replaced.  If you can send me some copies of

13   the parts catalog, I will be able to circle the proper parts.

14   After we order the parts (that is, heater core and rims and

15   wheels) we will hire Mike the mechanic's guy to do the work

16   (his name is Earl).  I want the car to be 100 percent so I can

17   give it to Joseph, my son, as that is the car he" --

18   Q      Turning to the second page of this document.

19   A      -- "likes.  There isn't any rush on this, but I think if

20   we chip away at it, it won't be too much of a problem, we

21   hope.  I also need a book.  The author is Norma Greene --

22   Norman Greene and the name is 'Body Language'.  Thank you for

23   your loyalty, as it is a difficult thing to find.  If you get

24   me Dwyer's address and Greg Gatto's and the tenants that were

25   at 7084 Via Leonardo, I will file my complaints myself.  I

WILLIAM HESSLE-DIRECT-DEAN                    750

1    need the names of the business and the stockholder and I need

2    the proper court to file them.  'Just ask a local attorney and

3    they will give you a list of where to file, based on venue and

4    dollar amount.'  Also, I will file my complaint against

5    Allison Gatto just to piss him off.  Oh yeah, by the way,

6    someone who testified against my brother just died at 50 years

7    old.  Ha ha ha ha ha ha."

8    Q    And turning to page 3 of this document.

9    A    "Both myself and my brother helped everyone we ever

10   encountered.  So when they do us wrong, some unsuspected

11   supernatural force intervenes and punishes them.  Remember

12   what happened to Rusty?  Be aware -- I mean beware all who

13   attempt injustice of the pure of heart.  Gotta go.  Love Joe."

14   Q    Now, turning your attention to the second page of this

15   document, the defendant says:  "If you get me Dwyer's address

16   and Greg Gatto's and the tenants that were at 7084 Via

17   Leonardo, I will file my complaints myself."  What is 7084 Via

18   Leonardo?

19   A    7084 Via Leonardo is a rental property owned by the

20   defendant.

21   Q    And who lives next door to 7084 Via Leonardo?

22   A    Dejvid Mirkovic.

23   Q    Was Greg Gatto a tenant at 7084 Via Leonardo?

24   A    Yes, he was.

25   Q    Now, turning your attention to the bottom of this page,

WILLIAM HESSLE-DIRECT-DEAN                          751

1    the defendant says:  "Oh yeah, by the way, someone who

2    testified against my brother just died at 50 years old."

3              Was the defendant's brother also prosecuted for coin

4    fraud?

5    A    Yes, he was.

6    Q    Do you know who the person is that he's referring to?

7    A    No, I don't.

8    Q    Now, turning your attention to the third page, the

9    defendant writes:  "Remember what happened to Rusty?"  Can you

10   remind the jury who Rusty is?

11   A    Rusty is also known as Russell Barnes.  He was a salesman

12   for the defendant, and he passed away in June of 2010.

13   Q    And at the time that he passed away, was he cooperating

14   with the government's prosecution of the defendant?

15   A    Yes, he was.

16              MS. DEAN:  Your Honor, may I have a moment?

17              THE COURT:  Yes.

18              (Pause.)

19              MS. DEAN:  No further questions, Your Honor.

20              MR. GOLTZER:  May we have a moment, Your Honor?

21              THE COURT:  You may.

22              MR. GOLTZER:  May I approach the witness for a

23   moment, Your Honor, to give him some exhibits?

24              THE COURT:  Yes, you may.

25              MR. GOLTZER:  May the record reflect, Judge, that

WILLIAM HESSLE-CROSS-GOLTZER                752

1   I'm handing the witness Government Exhibits 51, 52 and 53 for

2   his convenience.

3              THE COURT:  All right.

4   CROSS-EXAMINATION

5   BY MR. GOLTZER:

6   Q    Good morning, Mr. Hessle, how are you?

7   A    Fine, thank you.  Yourself?

8   Q    Good, thank you.  Now, Mr. Hessle, you've been with the

9   United States Attorney's Office for a long time?

10  A    Since August of 2009.

11  Q    And as someone with that experience, you are familiar

12  with the procedures that are followed in this court in the

13  Eastern District of New York?

14  A    Yes.

15  Q    You're familiar with proffers?

16  A    Yes, I'm familiar.

17  Q    Cooperation agreements?

18  A    Yes, I am.

19  Q    You've attended many proffers in many kinds of cases?

20  A    Yes, sir.

21  Q    And you've worked on a close basis with Assistant United

22  States Attorneys and law enforcement over the years?

23  A    That is correct.

24  Q    You've also attended many court proceedings?

25  A    That is correct.

WILLIAM HESSLE-CROSS-GOLTZER                753

1   Q    In fact, you were very much involved in solving the coin

2   fraud case and trying to get back money for the victims of Mr.

3   Romano's coin fraud; is that correct?

4   A    Yes, it is.

5   Q    And as somebody who is so intimately involved with that

6   particular case, you attended court proceedings?

7   A    I did.

8   Q    You attended proffer sessions?

9   A    I did.

10  Q    And on a regular basis, you conferred with Assistant

11  United States Attorneys?

12  A    Yes.

13  Q    The Assistant United States Attorneys involved in the

14  coin fraud case were not the two who are sitting here today?

15  A    That is correct.

16  Q    One of them was named Lara Gatz?

17  A    Correct.

18  Q    And she was not the only one who was involved in

19  prosecuting Mr. Romano for the coin fraud case, was she?

20  A    No, she was not.

21  Q    Who was the other one?

22  A    Thomas Sullivan.

23  Q    And how long did Tom Sullivan remain on that case?

24  A    Tom Sullivan remained on that case, I believe, until the

25  additional charges were bought against the defendant in this

WILLIAM HESSLE-CROSS-GOLTZER                754

1   matter, and it was moved to an Assistant U.S. Attorney in

2   Brooklyn.

3   Q    So Tom Sullivan was present at the time that Mr. Romano

4   was sentenced in February of 2012?

5   A    I believe so, yes.

6   Q    And, in fact, you were present at that time, too?

7   A    Yes.

8   Q    And wasn't it Mr. Tom Sullivan who argued the

9   government's position on sentence?

10  A    I believe so, yes.

11  Q    It was not Lara Gatz?

12  A    I believe so, yes.

13  Q    So it was Mr. Sullivan?

14  A    I would have to review this to see if, in fact, she was

15  in the courtroom and present at the time.

16  Q    To the extent that anything in front of you is necessary

17  to help you refresh your recollection, I'm sure the Court and

18  I and the government would have no objection to your referring

19  to it.

20          MR. MARSHALL:  No objection.

21          THE COURT:  Just let us know what you're using.

22  A    Okay.

23  Q    Thank you.  Does it appear on the first page of the

24  sentencing proceeding the appearances?

25  A    Yes.  It shows Tom Sullivan and Diane Leonardo-Beckman as

WILLIAM HESSLE-CROSS-GOLTZER                    755

1    the Assistant U.S. Attorneys that were there.

2    Q    So that would indicate, and it would help refresh your

3    recollection that Lara Gatz wasn't even present at the time

4    that Mr. Romano was sentenced?

5    A    Yes, it would appear that way.

6    Q    Yesterday, you referred to Mr. Mirkovic having something

7    known as a non-prosecution agreement; is that correct?

8    A    That is correct.

9    Q    And you indicated that Mr. Mirkovic was cooperating

10   against Mr. Romano; is that right?

11   A    Mr. Mirkovic intended to cooperate against Mr. Romano.

12   Q    Mr. Romano entered a guilty plea after the first day or

13   during the first day of jury selection in the coin fraud

14   trial; is that right?

15   A    That is correct.

16   Q    Which means that that case was scheduled and actually was

17   on trial; is that correct?

18   A    That is correct.

19   Q    And you know that in federal courts, there are certain

20   discovery obligations that the government has and the defense

21   has, as a matter of practice and law?

22   A    Yes.

23   Q    Not long before a trial is scheduled to begin, the

24   government turns over to a defense lawyer something known as

25   3500 material; is that right?

WILLIAM HESSLE-CROSS-GOLTZER                    756

1   A    Yes.

2         MR. GOLTZER:  I'm not going into substance, Judge,

3   just procedure.

4   Q    In connection with the trial that began concerning Mr.

5   Romano, was his lawyer Charles Carnesi at that time?

6   A    Yes.

7   Q    And was Mr. Carnesi, if you know, provided with what's

8   known as 3500 material prior to the commencement of the jury

9   selection?

10  A    I believe so, yes.

11  Q    And would that 3500 material consist of, in part, police

12  reports?

13  A    Police reports, interviews, things of that nature.

14  Q    It's basically statements of witnesses?

15  A    Yes.

16  Q    And if there is a cooperator who has entered into an

17  agreement with the government, is it part of the 3500

18  disclosure process to provide the witness with copies of the

19  non-prosecution or cooperation agreement?

20  A    Yes.

21  Q    Do you know whether Mr. Romano's lawyer was provided with

22  a copy of Dejvid Mirkovic's interviews, without telling us

23  what's in them, and his non-prosecution agreement?

24  A    Yes, I believe he was.

25  Q    So, to your knowledge, Mr. Carnesi was given notice prior

WILLIAM HESSLE-CROSS-GOLTZER                757

1   to the commencement of that trial that, in fact, Dejvid

2   Mirkovic was scheduled to testify against Joe Romano; isn't

3   that right?

4   A    I don't recall, to tell you the truth.

5   Q    You said that Mr. Mirkovic's 3500 material was provided

6   to Mr. Romano's lawyers?

7   A    Yes, it was.  Yes.

8   Q    So Mr. Romano's lawyer would have been notified that

9   Mirkovic was on a witness list?

10  A    Exactly.

11  Q    And he would have been notified that the government had

12  an intent to call Mr. Mirkovic?

13  A    I don't know if it was intended to call Mr. Mirkovic or

14  that he could possibly be called.

15  Q    But, in any event, he was aware that Mr. Mirkovic had

16  entered into the non-prosecution agreement?

17  A    Yes.

18  Q    There is a difference between what's known as a

19  non-prosecution agreement and what's known as a cooperation

20  agreement; is that correct?

21  A    I believe so.

22  Q    A non-cooperation agreement indicates that the government

23  is not going to file charges --

24          THE COURT:  You mean a non-prosecution agreement.

25          MR. GOLTZER:  I'm sorry?

WILLIAM HESSLE-CROSS-GOLTZER                    758

1          THE COURT:  You said a non-cooperation agreement.

2    You mean a non-prosecution agreement.

3          MR. GOLTZER:  Thanks for the correction.

4    Q    A non-prosecution agreement is indication that the

5    particular individual is not going to be prosecuted for a

6    crime?

7    A    That is correct.

8    Q    So in this particular situation, Dejvid Mirkovic was not

9    going to be prosecuted for his involvement with the Florida

10   coin company --

11   A    Yes.

12   Q    -- and any alleged fraud that may have occurred in

13   connection with those sales of coins; is that right?

14   A    Yes.

15   Q    And he agreed to testify against Mr. Romano?

16   A    That is correct.

17   Q    A cooperation agreement, on the other hand, generally

18   involves an agreement between the government and a cooperator,

19   where the cooperator enters into a guilty plea in exchange for

20   his cooperation?

21         MS. DEAN:  Objection.

22         THE COURT:  You permitted all this other stuff.  I

23   don't understand.

24         MS. DEAN:  It's a relevance objection.  Relevance,

25   Your Honor.

WILLIAM HESSLE-CROSS-GOLTZER                  759

1          THE COURT:  I think it's background to whatever he's

2     going into.  Go ahead.

3     A    Could you repeat the question, please?

4          (Record read.)

5     Q    Yesterday you were asked by the government about the word

6     "proffer"; is that correct?

7     A    Yes.

8     Q    Now, the government, as a matter of general experience on

9     your part, doesn't accept every person who wants to cooperate?

10    A    I assume that would be the case, but I'm never in a

11    position to --

12         THE COURT:  I don't want you to assume anything, so

13    don't answer.

14    Q    A proffer agreement is not a cooperation agreement?

15    A    That is correct.

16    Q    Under a proffer agreement in this district, a person

17    comes to court, comes to the prosecutor's office and gets

18    what's known as a Queen for a Day; is that right?

19    A    Yes.

20    Q    Are you old enough to remember the program?

21         THE COURT:  Do we really need all this?

22         MR. GOLTZER:  I'll cut it short, Judge.

23    Q    The point, sir, is before someone enters into a formal

24    cooperation agreement, he goes through a proffering process --

25    A    Yes.

WILLIAM HESSLE-CROSS-GOLTZER                    760

1   Q    -- where the government evaluates whether or not to use

2   him as a cooperator.

3   A    Yes.

4   Q    Or her.  Now, you referred to a plea agreement yesterday

5   that was introduced in evidence.  Do you recall that?

6   A    I did.

7   Q    You indicated that there was a separate -- a separation

8   between forfeiture and restitution; is that right?

9   A    Yes, sir.

10  Q    In this particular case, you were present at the time of

11  the plea that was entered by Mr. Romano; is that correct?

12  A    Yes.

13  Q    And you've had a chance to review the plea hearing

14  transcript?

15  A    Yes.

16  Q    Do you recall that Ms. Gatz placed on the record that she

17  and her office were going to recommend to the Attorney General

18  of the United States that the restitution be satisfied by the

19  forfeiture of the 7 million dollars?

20  A    I would have to review the agreement to see.

21  Q    May I refer you to help refresh your recollection to page

22  676.

23          THE COURT:  Page 676?

24          MR. GOLTZER:  Yes, sir.

25          THE COURT:  I don't have a 676.

WILLIAM HESSLE—CROSS—GOLTZER                761

1          MR. GOLTZER:  I'll get it.  It's a plea transcript.

2     I'm sorry, I got the wrong page.  Please bear with me, Judge.

3     I apologize.

4          THE COURT:  That's all right.  Are you talking about

5     the last page of Exhibit 52, which is not noted on my list, in

6     my book.  It would be page 251.

7          MR. GOLTZER:  No, it's not the last page, Your

8     Honor.  I will find it in a moment.  Page 232.  May I read

9     this into the record, Judge?

10          THE COURT:  The exhibit is in evidence; right?

11     Q     Do you recall Ms. Gatz stating the following at the plea

12     of Mr. Romano?  "Yes, Your Honor, but before I do that, if

13     it's okay, forfeiture for all the defendants is not in the

14     agreement, but I indicated I would put this on the record.

15     The government will make a recommendation to the Department of

16     Justice that the restitution order, which is mandatory, be

17     satisfied by the forfeiture that's going to be tendered

18     through the plea agreement."

19          Do you remember that?

20     A     Yes.

21     Q     And then she continued, I'm quoting:  "However, as the

22     defendants have acknowledged through counsel, the Eastern

23     District of New York recommendation to the Department of

24     Justice is not binding on the Department of Justice and the

25     Department of Justice has the right to decline to follow the

WILLIAM HESSLE-CROSS-GOLTZER                    762

1    recommendation, which decision is not reviewable by the

2    Court."  Do you recall that?

3    A    Yes.

4    Q    And to continue into the last part of the quote:  "In

5    sum, we will make the recommendation, but the DOJ does not

6    have to follow it."

7              THE COURT:  That means the Department of Justice.

8    That's the central part of the Attorney General's Office in

9    Washington.

10             MR. GOLTZER:  Thank you, Judge.

11   Q    "And the defendants could have to pay mandatory

12   restitution in addition to the previously tendered

13   forfeiture."

14             Do you recall that being said?

15   A    Yes.

16   Q    Now, while that was not in the written plea agreement,

17   you overheard that promise made by Ms. Gatz on the record; is

18   that correct?

19   A    It's the promise of a recommendation, yes.

20   Q    That is correct.  And do you know whether the

21   recommendation was ever made?

22   A    I don't think a recommendation is made or a petition is

23   made to the Department of Justice until the entire restitution

24   issue has been resolved.

25   Q    So that restitution issue has not been resolved to this

WILLIAM HESSLE—CROSS—GOLTZER                     763

1   day; is that correct?

2   A    That is correct.

3   Q    So it was indicated that there would be a hearing first?

4   A    Yes.

5   Q    And then this office was going to recommend to Justice

6   that there not be additional restitution, but that it be

7   satisfied by the 7 million dollar forfeiture?

8   A    I'm not sure that's the way that agreement read.  I

9   think, if I remember correctly, Ms. Gatz said that she would

10  recommend to the Department of Justice.  And even in this

11  particular case, the restitution amount far exceeds the

12  forfeiture.  So the forfeiture amount would not eliminate the

13  balance of the restitution.

14  Q    But that hasn't been resolved?

15  A    It's still out there.

16  Q    Now, let me call your attention to the plea agreement,

17  which is Government Exhibit 51.  Oh, before I do that, at the

18  plea hearing, Federal District Court Judges ask a series of

19  questions; is that correct?

20  A    Yes.

21  Q    They ask a series of questions about the defendant's

22  capacity to understand what's going on?

23  A    Yes.

24  Q    And Mr. Romano was asked, among other things, as you

25  recall, whether he had ever been under the treatment of a

WILLIAM HESSLE-CROSS-GOLTZER                    764

1   psychiatrist; is that correct?

2   A     I believe so, yes.

3   Q     And his answer was no?

4   A     Yes.

5   Q     And he was asked whether he understood that he had

6   particular rights; is that correct?

7   A     Yes.

8   Q     Such as the right to a trial by jury, right to counsel,

9   if he couldn't afford one they'd give him one; right?

10  A     Yes.   Judge Bianco went through the entire routine of

11  that.

12  Q     And he went through it very slowly, deliberately and

13  clearly?

14  A     Yes.

15  Q     And after each of those questions, he asked Mr. Romano

16  whether he understood?

17  A     Yes.

18  Q     And Mr. Romano replied that he did?

19  A     Yes.

20  Q     It didn't appear that anybody was forcing Mr. Romano to

21  enter a guilty plea, did it?

22  A     Not -- to me, it didn't appear that way.

23  Q     And, in fact, the judge asked Mr. Romano, have you had a

24  chance to talk to your lawyer, Mr. Carnesi?

25  A     Yes.

WILLIAM HESSLE—CROSS—GOLTZER                    765

1   Q    And Mr. Romano said yes; is that right?

2   A    Yes.

3   Q    And the judge asked Mr. Romano whether he had sufficient

4   time to have Mr. Carnesi answer all of his questions.  Is that

5   right as well?

6   A    Yes.

7   Q    And he asked the judge -- the judge asked Mr. Romano

8   whether he knew what he was doing and whether he was pleading

9   guilty knowingly and voluntarily.  Is that correct?

10  A    Yes.

11  Q    And did the judge also explain, in your presence, to Mr.

12  Romano that there was going to be prepared a probation report?

13  A    A presentence report.

14  Q    Presentence report?

15  A    Yes.

16  Q    And did the judge explain to Mr. Romano that the judge

17  wasn't bound by it?

18  A    I believe so, yes.

19  Q    That federal judges are not bound by any agreement

20  between the prosecution and the defense?

21  A    As far as guidelines go, yes.

22  Q    Correct.  And the judge explained to Mr. Romano, in your

23  presence, that the guideline recommendation from the probation

24  department was simply advisory; is that correct?

25  A    Yes.

WILLIAM HESSLE-CROSS-GOLTZER                    766

1   Q     And that Mr. Romano, when he pled guilty, was going to be

2   subjected to a possible maximum penalty of 20 years; is that

3   right?

4   A     Yes.

5   Q     Without a minimum sentence?

6   A     Yes.

7   Q     And that the judge could give Mr. Romano more or less

8   than the advisory guideline range?

9   A     That is correct.

10  Q     And if Mr. Romano, the judge told him, was not satisfied

11  with the sentence that he got, he couldn't take his plea back?

12  A     Yes.

13  Q     Did the judge also explain some of the provisions of the

14  agreement to Mr. Romano, the plea agreement?

15  A     Yes.

16  Q     In fact, he showed it to him; is that correct?

17  A     Yes.

18  Q     He held it up to Mr. Romano and he asked Mr. Romano if,

19  in fact, that was his signature on the plea agreement; is that

20  right?

21  A     Yes.

22  Q     Mr. Romano identified his signature and told the judge he

23  had read the plea agreement?

24  A     Yes.

25  Q     And that he understood it?

WILLIAM HESSLE-CROSS-GOLTZER                    767

1   A    Yes.

2   Q    And then the judge asked Mr. Romano to explain what it

3   was that he had done wrong, and Mr. Romano made the statement

4   that the government had read into evidence yesterday,

5   admitting his guilt on the coin fraud.

6   A    Yes.

7   Q    Now, with respect to the plea agreement, Government

8   Exhibit 51 -- do you have that in front of you?

9   A    I do.

10  Q    Now, as long as I can find mine, we'll be okay.

11  Referring to the first page, the maximum sentence that Mr.

12  Romano faced with respect to the single count to which he pled

13  was 20 years.

14  A    Yes, that's what it says.

15  Q    The original indictment contained a second count; is that

16  correct?

17  A    Yes, it did.

18  Q    And the second count was a violation of 18 United States

19  Code 1956, what is commonly known as money laundering; is that

20  right?

21  A    Yes.

22  Q    You are aware that there are significant penalties for

23  money laundering, potential penalties?

24  A    Yes.

25  Q    Do you know what they are?

WILLIAM HESSLE-CROSS-GOLTZER                    768

1    A     Not off the top of my head.

2          MR. GOLTZER:  Would the Court take judicial notice

3    that it's a 20-year penalty for 1956, potential, with no

4    minimum?

5          THE COURT:  You know what, I don't know off the top

6    of my head.  If you make that representation to me and if the

7    government has no objection, I'll accept it.

8          MR. GOLTZER:  I appreciate that from the government

9    and thank the Court.

10   Q     So Count One of the superseding indictment that is

11   already in evidence contained a charge of a conspiracy, a

12   fraud conspiracy, federal, that contains a potential maximum

13   penalty of 20 years?

14   A     Yes.

15   Q     Count Two, as the Court has just judicially noticed,

16   without objection from the prosecution, contained a second

17   count of money laundering that contained a potential

18   punishment, in terms of prison time, of 20 years without a

19   minimum; right?

20   A     Yes.

21   Q     For a total potential jail term of 40 years?

22   A     Correct.

23   Q     Would you agree that as part of the plea agreement

24   between Mr. Romano and the government, the potential 40-year

25   penalty was reduced to a potential 20-year maximum penalty?

1    A    Yes.

2    Q    And the government agreed to dismiss or ask the Court to

3    dismiss the money laundering count?

4    A    That is correct.

5    Q    Were you present for any of the negotiations between

6    defense counsel and the government, in terms of this

7    particular plea agreement, Government's 51 in evidence?

8    A    I don't recall.  I don't believe I was.

9    Q    Yesterday, you were asked about a guideline system; is

10   that correct?

11   A    Yes.

12   Q    You have some familiarity with it?

13   A    I do.

14   Q    Just for background, a couple of quick questions, if I

15   may.  The federal sentencing guidelines are contained in a

16   fairly complex book?

17   A    Yes.

18   Q    And they're based on a grid point system?

19   A    That is correct.

20   Q    In terms of the offense that one commits, there is a

21   series of numbers on the left side of the chart that goes from

22   1 to 43.

23   A    I have never done the calculation, the guidelines

24   calculations for a defendant.  So I may have seen a guide book

25   for guidelines, but I couldn't actually tell you what was in

WILLIAM HESSLE-CROSS-GOLTZER                    770

1    there.

2    Q    Can we agree that after everything is said and done, the

3    probation department makes a guideline calculation involving a

4    number of points?

5    A    Yes.

6    Q    The higher the points, the higher the guideline

7    calculation?

8    A    Yes.

9    Q    The lower the points, the better off the defendant is, in

10   terms of the guideline calculation?

11   A    Yes.

12   Q    And then there's a criminal history score from one to

13   six, and the lower the score, the lower the guideline points?

14   A    Yes.

15   Q    And there are guideline calculations contained in the

16   plea agreement between Mr. Romano and the government; is that

17   correct?

18   A    Yes.

19   Q    And they appear on page 2, if I can call your attention

20   to them.  You already indicated yesterday in response to the

21   government's questions that the office, meaning the government

22   office, estimated the guideline level to be 34, which carries

23   an advisory guideline calculation of 151 to 188 months; is

24   that correct?

25   A    I know it's 151 to 188.  I don't know if it was a level

1    34.

2    Q    Well, it's in the agreement in evidence, all right?

3    A    Yes.

4    Q    And there are a number of -- a list of numbers next to

5    it, correct, on page 2?

6    A    Yes.

7    Q    And the base offense level is 7?

8    A    That is correct.

9              MS. DEAN:  Objection.

10             MR. GOLTZER:  It's in evidence.

11             THE COURT:  It's in evidence, isn't it?

12             MS. DEAN:  Your Honor, the witness has said that he

13   doesn't know how to compute the guidelines calculation.

14             THE COURT:  But you put this in evidence.

15             MS. DEAN:  Yes, Your Honor.

16             THE COURT:  And since it's in evidence, he can

17   inquire about it.  Overruled.

18             MR. GOLTZER:  Thank you, Judge.

19   Q    Now, the amount of the loss adds to the guideline

20   calculation, adds to the points?

21   A    Yes.  According to this, yes.

22   Q    And the government accepted a loss -- well, you were

23   present at the sentence?

24   A    Yes.

25   Q    At the sentence, the Court adopted the guidelines in this

WILLIAM HESSLE-CROSS-GOLTZER                    772

1    plea agreement?

2    A    Yes, that is correct.

3    Q    So the parties, Mr. Romano and the government, agree to

4    this guideline calculation?

5    A    Yes.

6    Q    With respect to the amount of loss?

7    A    With respect to all of the items that are listed here.

8    Q    Which would indicate the loss?

9    A    Yes.

10   Q    The number of victims?

11   A    Yes.

12   Q    In fact, the number of victims that the Court adopted was

13   250 rather than 1500 --

14   A    Yes.

15   Q    -- at the time of the sentence.

16   A    That is correct.

17   Q    And that's what was done in the plea agreement as well?

18   A    Yes.

19   Q    Because there would have been more points if it was 1500

20   victims?

21   A    Yes.

22   Q    And what happened was many of the victims weren't

23   contacted or didn't respond; is that correct?

24   A    That's not correct.

25   Q    Correct me if I'm wrong.  Go ahead.

WILLIAM HESSLE-CROSS-GOLTZER                    773

1    A    I'm trying to -- again, I wasn't present for the

2    negotiations of this guidelines calculation or anything like

3    that.  But I can tell you that, for the most part, every

4    attempt was made to contact every victim, every potential

5    victim.

6              And the problem we had was that many of the victims

7    were deceased.  And in addition to that, some of them had

8    actually been institutionalized.  Either that or we were

9    unable to contact the next of kin.

10   Q    And that was a result, of course, of the victims' age?

11   A    Exactly.

12   Q    Because the average age of the victim over the course of

13   the years was about 74 years old?

14   A    That is correct.

15   Q    So you were doing your best to find them, and some of

16   them just couldn't be found?

17   A    But an attempt was made to contact every potential

18   victim.

19   Q    And as a result of that, Mr. Romano agreed, on page 2, to

20   accept a two-point increase because victims were vulnerable?

21   A    Yes.

22   Q    And for his role in the offense, because he was a

23   supervisor or manager, in other words, the owner, he took a

24   four-point bump up?

25   A    Yes.

WILLIAM HESSLE—CROSS—GOLTZER                    774

1    Q    And then there was a two-point reduction for something

2    called acceptance of responsibility?

3    A    That's what it says, yes.

4    Q    And the government agreed with Mr. Romano to give him two

5    points for accepting responsibility for the crime that he

6    committed; is that right?

7    A    Yes.

8    Q    And then there was a one-point reduction for something

9    known as a global plea; is that right?

10   A    Yes.

11   Q    Do you know what a global plea is?

12   A    In this particular case, I do.

13   Q    Please tell the jury.

14   A    This is an instance in which a number of defendants

15   agreed, all agreed to plead guilty at the same time, and for

16   doing that, they were all granted a point reduction in the

17   guidelines.

18   Q    And that saved the government some money, presumably, by

19   not having to try the case?

20   A    Again, I'm not privy as to why these things happened or

21   are calculated, but I would assume.  I'm not supposed to

22   assume, but that's what it appears.

23        MR. GOLTZER:  I'll withdraw the question then.  I

24   have no objection if the Court wants the answer stricken.

25        THE COURT:  No.  Unless the government wants it

1    stricken, we'll leave it in.  All right.

2          The bottom line is the guideline level ended up 34;

3    right?

4    A    Yes, Your Honor.

5          THE COURT:  And the scope of the 34 with a Criminal

6    History Category Number I is 151 to 188 months; right?

7    A    That is correct, Your Honor.

8          THE COURT:  Okay, fine.  We've established that now

9    several times.

10   Q    Paragraph 4 of the agreement, if I may read it to the

11   jury or publish it, as the government likes to say.  Paragraph

12   4, and I quote:  "The defendant agrees not to file an appeal

13   or otherwise challenge, by petition, pursuant to 28 U.S. Code

14   255, or any other provision, the conviction or sentence in the

15   event that the Court imposes a term of imprisonment of 188

16   months or below.  This waiver is binding, without regard to

17   the sentencing analysis used by the Court.  The defendant

18   waives all defenses based on the statute of limitations and

19   venue with respect to any prosecution that is not time-barred

20   on the date that this agreement is signed in the event that,

21   A, the defendant's conviction is later vacated for any reason;

22   B, the defendant violates the agreement; or C, the defendant's

23   plea is later withdrawn."  And I close the quote.

24          That was one of the things explained to Mr. Romano

25   when he was taking this plea before the judge?

WILLIAM HESSLE—CROSS—GOLTZER                    776

1   A    Yes.

2   Q    Do you know what a Pimentel letter is?

3   A    No.

4   Q    Have you ever seen --

5            THE COURT:  Wait a minute.  Wet don't have a

6   Pimentel letter in this case.  We have a plea agreement.  A

7   Pimentel letter is completely different than a plea agreement.

8            MR. GOLTZER:  That was my point.

9            THE COURT:  Are you a lawyer?

10  A    No, Your Honor.

11           THE COURT:  Okay.  Do you know what Pimentel is?

12  A    No, Your Honor.

13           THE COURT:  Okay.  Let's move on.

14           MR. GOLTZER:  Very well, Judge.

15  Q    And then, in paragraph five of the plea agreement, the

16  defendant agreed to forfeit to the United States all of his

17  right, title and interest in 7 million dollars; is that

18  correct?

19  A    Yes.

20  Q    And the defendant, under the terms of the agreement, was

21  required to make a full and complete and accurate and honest

22  statement of all of his property; is that correct?

23  A    Yes.

24  Q    And if he failed to do so, that would be viewed by the

25  government as a material breach of the agreement; is that

WILLIAM HESSLE–CROSS–GOLTZER                    777

1   correct?

2   A    Yes.

3   Q    And the government would no longer be bound by the

4   agreement?

5   A    Yes.

6   Q    The government, as part of the agreement, agreed not to

7   seek a sentence above 188 months?

8   A    I believe so, yes.

9   Q    And at the time of the sentencing, the government, in

10  fact, lived up to its agreement?

11  A    Yes.

12  Q    Mr. Romano's lawyer, as was his right, asked for less

13  than 151 months?

14  A    Yes.

15  Q    And it didn't happen?

16  A    That is correct.

17  Q    The judge gave him a 180-month sentence, or 15 years?

18  A    Yes.

19  Q    Yesterday, you were asked about a probation officer by

20  the name of Giblin.  Do you remember that?

21  A    Yes, I do.

22  Q    It was Mr. Giblin who prepared Mr. Romano's probation

23  report?

24  A    He did.

25  Q    Presentence report.  Would you agree that the judge

WILLIAM HESSLE-CROSS-GOLTZER                778

1   wasn't bound by that?

2   A    That is correct.

3   Q    In fact, do you recall that Mr. Giblin recommended a

4   higher sentencing guideline than 34?

5   A    Yes.

6   Q    And do you recall that the judge, Judge Bianco, at the

7   time of the sentence, declined to follow Giblin's

8   recommendation and give Mr. Romano a higher sentence?

9   A    Judge Bianco agreed with the guideline range in the plea

10  agreement.

11  Q    Rather than Mr. Giblin's guideline range?

12  A    Yes.

13  Q    And, as you indicated before, Judge Bianco wasn't legally

14  required to do that.  As he explained to Mr. Romano, I'm the

15  judge, I'll make my own decision.

16  A    Yes.

17  Q    You were present in court during the Romano proceedings

18  over a couple of years; right?

19  A    Since his arrest in November of 2008, yes.

20  Q    And you've been in court on most of the occasions when

21  hearings have been scheduled?

22  A    I believe so, yes.

23  Q    And you've been notified on occasion that hearings have

24  been postponed?

25  A    Yes.

WILLIAM HESSLE-CROSS-GOLTZER                779

1   Q    Or rescheduled?

2   A    Yes.  I'm told, in the event that there is an activity,

3   usually the Assistant U.S. Attorney tells me this has been

4   postponed or something's been rescheduled or something like

5   that.

6   Q    That's not an unusual occurrence?

7   A    Yes.

8   Q    Things are often rescheduled and have often been

9   rescheduled in this case?

10  A    Yes.

11  Q    The restitution hearing, for example, has been postponed

12  and rescheduled several times?

13  A    Yes.

14  Q    Did you happen to inquire or make an investigation of how

15  many calls there were between Mr. Romano and Mr. Mirkovic

16  prior to August 1st, 2012?

17  A    Yes, I did.

18  Q    And prior to August 1st of 2012, can you tell the jury,

19  if you recall, approximately how many calls there were between

20  Mr. Romano and Mr. Mirkovic?

21  A    I would have to review my records on that.  I wouldn't

22  want to guess.

23  Q    Is it hundreds?

24  A    There were hundreds of calls placed, yes.

25  Q    But it wasn't a couple of calls?

WILLIAM HESSLE-CROSS-GOLTZER                     780

1   A    No.

2   Q    So there was -- prior to August 1st of 2012, Mr. Romano

3   made many calls to Mr. Mirkovic?

4   A    No.  The hundreds of calls includes the calls placed in

5   August and September of 2012.

6   Q    So there were 200-and-some odd calls or 100-and-some odd

7   calls by Mr. Romano to Mr. Mirkovic from August to September?

8   A    There were 273 calls placed between Mr. -- the defendant

9   and Mr. Mirkovic between August and September.  I would have

10  to, like I said, look at my records to determine how many

11  calls had been placed prior to August 1st of 2012.

12  Q    Fair enough.

13  A    But there weren't -- there weren't that many.

14  Q    Well, you said there were hundreds.  Was there a hundred,

15  if you recall?

16  A    Well, incorporating the amount of calls placed.  There

17  were 273 between August 1st and September 28th.  That's

18  hundreds right there.

19  Q    Were there other hundreds or other calls --

20  A    No, there weren't other hundreds.  There were other

21  calls.

22  Q    On his PIN number or different PIN numbers?

23  A    Different PIN numbers.

24  Q    So prior to August 1st of 2012, Mr. Romano was using

25  different PIN numbers to call Mr. Mirkovic?

WILLIAM HESSLE-CROSS-GOLTZER                      781

1    A    Yes.

2    Q    Did Mr. Romano use different PIN numbers to call his

3    wife?

4    A    Not that I'm aware of.

5    Q    Or anybody else?

6    A    Not that I'm aware of.

7    Q    So it was just Dejvid Mirkovic?

8    A    I believe we -- when I did the analysis, I focused

9    primarily on calls to Mr. Mirkovic.  There may have been some

10   to other individuals, but I'm not aware of that.

11   Q    So you don't know?

12   A    I don't know.

13   Q    And Mr. Romano referred on a tape, as the jury just

14   heard, to having three commissary accounts.  Do you know what

15   that means?

16   A    Yes, I do.

17   Q    What is it?

18   A    It means that he was utilizing other inmates' commissary

19   accounts to obtain access to their PIN number so he could use

20   their phones.

21   Q    And he would also be using the commissary accounts or

22   could use the commissary accounts to get access to extra food?

23   A    That's possible.

24   Q    Because there is a limit on the amount of money that an

25   inmate in the Nassau County Jail, as you know, can spend on

WILLIAM HESSLE-CROSS-GOLTZER                    782

1    his commissary for food and other conveniences of life?

2    A    Yes.

3    Q    And if you put money in somebody else's commissary

4    account, you can buy him something, you can buy yourself

5    something?

6    A    You could.

7    Q    You mentioned Rusty Barnes yesterday.  Do you know what

8    he passed away from?  Did you find out?

9    A    Rusty Barnes had a heart condition.

10   Q    Did he have a heart condition, if you know, before he

11   went to jail?

12   A    He had health problems, I know that.  I don't know

13   specifically if it was a health -- if it was a heart

14   condition, but he had issues.

15   Q    Did he apparently die from natural causes?

16   A    It appeared that way.

17   Q    No charges were filed in connection with the death of

18   Rusty Barnes?

19   A    Not that I'm aware of.

20   Q    Was Mr. Romano's house searched when he was arrested in

21   Florida?  Did you get a search warrant to search his house?

22   A    The arrest warrant for the defendant was issued --

23           THE COURT:  Wait a minute.  Are we talking at the

24   point when his bail was revoked in the coin case; is that what

25   we're talking about?

WILLIAM HESSLE-CROSS-GOLTZER                    783

1          MR. GOLTZER:  Yes.

2          THE COURT:  Okay.  So that you're clear on what

3     we're talking about.

4     A    Mr. Romano was arrested in March of 2010, on an arrest

5     warrant that was executed by the U.S. Marshal Service.

6     Q    That's because he violated, apparently violated his --

7     A    Yes.  There was no search of his residence.  There was no

8     search warrant of his residence at that time.

9     Q    Was there subsequently a search warrant of his residence,

10    if you know?

11    A    Not that I'm aware of.

12    Q    Was there a search warrant conducted in connection with

13    the initial prosecution of the coin fraud in 2008, I think?

14    A    There was a search done of the business, not the

15    residence.

16    Q    How many search warrants were procured, if you know?

17    A    I'm sorry?

18    Q    There was no search of his house?

19    A    No.

20    Q    Now, you mentioned yesterday that there was a self

21    surrender; is that correct?

22    A    Yes.

23    Q    What does that mean?

24    A    The attorney is notified that his client has been

25    indicted or an arrest warrant has been issued for him.  And in

1    this case here, he happened to be located in Florida.  And he

2    was allowed to surrender himself with Mr. Carnesi to the

3    Postal inspectors in Hicksville.

4    Q    And that was a courtesy, really?

5    A    Absolutely.

6    Q    It's extended in certain kinds of cases where you're not

7    particularly concerned he's going to run away; right?

8    A    Depending upon the circumstances.  That could be one.

9    Q    And as you evaluated the circumstances -- was it your

10   decision or someone else's decision?

11   A    It was not my decision.

12   Q    Whose was it, if you know?

13   A    I imagine it was the U.S. Attorney's decision.

14   Q    To let him surrender rather than have himself arrested

15   and brought in in handcuffs?

16   A    I'm assuming it was done through consultation with

17   counsel, but I'm not privy to those conversations.

18   Q    You've had a chance to observe Mr. Romano speaking to

19   Judge Bianco over the last couple years?

20   A    Yes, especially when he went pro se, representing

21   himself.

22   Q    Did he ever curse at the judge?

23   A    I never heard him curse, no.

24   Q    Did he ever get held in contempt by the judge?

25   A    Not that I'm aware of.

1  Q    Did he ever, to use a phrase, give the judge hell?

2  A    I don't believe so.

3  Q    He always appeared, in your experience, to be

4  appropriately respectful to a United States Court District

5  Judge?

6  A    Exclusive of the two times he failed to show up in court,

7  yes.

8  Q    Okay.  But if he wasn't there, he couldn't yell at the

9  judge?

10 A    Well, he refused to get on the bus.

11 Q    Well, that's a different question, isn't it?

12 A    Well, it's still appearance-related.

13 Q    But he wasn't held in contempt for it?

14 A    No.

15 Q    The point is, when he was in the courtroom, he didn't,

16 quote, give the judge hell?

17 A    No.

18 Q    Now, you were present when Mr. Romano was sentenced?

19 A    Yes, I was.

20 Q    And you heard him speak to the judge?

21 A    I did.

22        MR. GOLTZER:  Your Honor, may I publish what is in

23 evidence by reading it to the jury?

24        THE COURT:  What is the exhibit number?

25        MR. GOLTZER:  Government Exhibit 53, what is

WILLIAM HESSLE–CROSS–GOLTZER                    786

1    premarked as page 29.

2              THE COURT:  It's in evidence.  You can certainly

3    publish part of it, and if the government wants to publish the

4    rest, they can too.  Yes, go ahead.

5              MR. GOLTZER:  Thank you.

6              THE COURT:  Okay.

7              (Exhibit published to jury.)

8    Q    "The Court:  Thank you, Mr. Goidell."  Mr. Goidell was

9    the attorney representing Mr. Romano at the time of the

10   sentencing?

11   A    Yes.

12   Q    "Mr. Romano, you also have the right to speak on your own

13   behalf in connection with the sentencing.  This is your

14   opportunity to do that.  You can remain seated.  Just keep

15   your voice up so that everybody can hear you.  Okay."

16             Then by Mr. Romano, and I'm quoting:  "Your Honor, I

17   am here before you and I am guilty of fraud.  I owned and

18   operated coin companies with over-graded coins and charged

19   exorbitant prices and misrepresented the value of the coins.

20   I defrauded and I collected the profits.  I witnessed salesmen

21   making promises, stating that customers would see returns on

22   their money when they resold their coins to other investors.

23             As time went on, this became a criminal enterprise.

24   When this business started, I had more honest ambition.

25   However, through my selfishness and lack of concern, the

WILLIAM HESSLE—CROSS—GOLTZER                    787

1   company spiraled out of control and people got ripped off.  I

2   believe the -- some of the victims are in the room, and I want

3   to say that I'm sorry.  I'm sorry about your losses and I'm

4   sorry about any of the suffering that I caused because of my

5   selfishness.  I read all the letters that the victims wrote

6   and how I affected their lives, and it broke my heart.

7          I wish that I could take this back, but I can't.  My

8   only recourse is that my restitution might make these people

9   whole again and at some level, through rehabilitation and my

10  work in helping others in society, they will benefit and I can

11  restore their confidence in me.

12         Although I believe that I was a good person before

13  these crimes, I have changed my life around and it has taken a

14  new direction.  I've spent many hours talking with my pastor,

15  and I expect to follow on the ideas of feeding and building

16  shelters for the homeless.

17         I've always involved my children in my charities and

18  will continue to teach them and lead them in that direction.

19  They know me as a good father, and that's the impression that

20  I want to leave with them.  I have many talents and I have

21  talked to my pastor about using them for good.

22         I'm a carpenter and I build houses.  I've done many

23  renovations, and I'm a visionary as well as a hard worker.

24  I've helped many people while incarcerated and have enjoyed

25  teaching ground school classes to inmates who are interested

WILLIAM HESSLE-CROSS-GOLTZER                    788

1    in flying.  This is something that I'd like to continue when I

2    return home.  I have been teaching my oldest son, Joseph, who

3    is here in the courtroom, how to fly, and I would like to

4    continue to teach my other children and their friends that way

5    of life.

6             I have also discovered this 12-step program while

7    incarcerated at the Nassau County Jail in the DART program,

8    and have basically learned skills to maintain a balanced life.

9    It's taught me that only people -- the only people who are

10   uncurable are the ones that can't be honest and that people

11   are capable of good and failure and we must always be on guard

12   against ourselves and our success and, most important, we have

13   to try to hold onto a sense of perspective no matter how

14   content or comfortable we become.

15             I want only to live in peace with myself and with

16   others.  I pray today that you can see what's in my heart and

17   realize that my intentions were never to create outcomes of

18   these victims.  Again, I am sorry.  I'm asking His Honor for a

19   second chance as to make myself whole as well as my victims

20   whole.

21             A little story.  About two years ago my oldest son,

22   Joseph, came to visit me at the jail, and he said to me, he

23   said, Daddy, do you think that this happened to us because you

24   stopped going to church and you stopped with religion and the

25   bible?  And I really didn't know how to answer him.  And I can

WILLIAM HESSLE-REDIRECT-DEAN                    789

1    answer him today, and my answer is yeah, I think so.

2            But this wasn't a punishment.  This was an

3    eye-opener to me, and I want to continue in that direction in

4    teaching my kids, because I've always taught them well.

5    Thanks, Your Honor.  That's my piece."

6            Do you recall that being said by Mr. Romano at the

7    time of his sentence?

8    A    Yes.

9    Q    And then the judge gave him 15 years?

10   A    Yes.  Judge Bianco gave him 15 years.

11   Q    The sentence he agreed not to appeal?

12   A    Yes.

13           MR. GOLTZER:  I have no further questions at this

14   time.  Thank you very much.

15           THE COURT:  Okay.  Any redirect?

16           MS. DEAN:  Yes, Your Honor.

17           THE COURT:  Okay.

18   REDIRECT EXAMINATION

19   BY MS. DEAN:

20   Q    Mr. Hessle, you were asked about the fact that AUSA Gatz

21   didn't argue at the defendant's sentencing hearing.  Do you

22   recall those questions?

23   A    Yes.

24   Q    Who argued at the defendant's sentencing hearing?

25   A    Assistant U.S. Attorney Thomas Sullivan.

WILLIAM HESSLE-REDIRECT-DEAN                    790

1    Q    Now, did you listen to calls made by the defendant from

2    the Nassau Jail that predated that sentencing hearing?

3    A    Yes, I did.

4    Q    In any of these calls, did the defendant discuss AUSA

5    Gatz?

6    A    Yes, he did.

7    Q    In any of these calls, did the defendant -- well, what do

8    you recall the defendant saying about AUSA Gatz?

9    A    Many derogatory things.  Vulgar things.

10   Q    Can you give an example?

11   A    He used to address her as the C word quite often.  And he

12   would also -- he would frequently reference her in

13   conversations when it came to the fact that he's, you know,

14   being held for a crime to which -- how do I put this?  To a

15   crime that -- or a sentence that people that commit violent

16   crimes don't receive.

17   Q    But the calls that you were referring to where he refers

18   to AUSA Gatz as the C word, that was during the pendency of

19   the prosecution before he was sentenced?

20   A    Some were, yes.

21   Q    Now, you were also asked some questions about Dejvid

22   Mirkovic's non-prosecution agreement.  Do you recall those

23   questions?

24   A    Yes, I do.

25   Q    Now, when Dejvid Mirkovic agreed to cooperate in the

WILLIAM HESSLE-REDIRECT-DEAN                791

1  government's investigation, would you say that he was a

2  willing cooperator?

3  A    No, he was not.

4  Q    How would you describe his cooperation?

5  A    He -- there was difficulty as far as determining his

6  sincerity as to whether or not he really was choosing to

7  cooperate with the government.  That's about the best I can

8  put it.

9  Q    Now, you were also asked some questions about whether

10 3500 material was sent to the defendant prior to trial.  Do

11 you recall those questions?

12 A    Yes.

13 Q    And you were asked whether the defendant would have

14 known, prior to trial, that Mirkovic could be testifying

15 against him.  Do you recall those questions?

16 A    Yes, I do.

17 Q    Now, did the defendant plead guilty as soon as he

18 received that 3500 material and found out Dejvid Mirkovic was

19 cooperating against him?

20 A    I believe he found out about the cooperation just prior

21 to the trial and --

22 Q    Receiving the 3500 material?

23 A    Yes.  I recall Mr. Carnesi making reference to the fact

24 that he could never win that trial because of Mirkovic.  So he

25 had access to the 3500.

WILLIAM HESSLE-REDIRECT-DEAN                          792

1   Q     But he didn't plead guilty until trial had actually

2   started?

3   A     He pled guilty at jury selection.

4   Q     Now, two months after the defendant pled guilty, what did

5   he do with respect to his attorney?

6   A     In November of 2010, he fired Mr. Carnesi.

7   Q     Now, after the defendant was sentenced to 15 years, what

8   did he do with his attorney who was representing him at that

9   time?

10  A     That individual was Mark Goidell.  The defendant was

11  sentenced in February in 2012.  In March of 2012, he fired

12  Mr. Goidell.

13  Q     Now, at this time, I'm showing you what's been marked for

14  identification purposes as Government Exhibit 42.  Do you

15  recognize this document?

16  A     I do.

17  Q     What is it?

18        MR. GOLTZER:  Objection.  We have an objection to

19  this particular exhibit, and perhaps a sidebar would be

20  useful, if the Court wanted to give the jury a break now.

21        THE COURT:  I don't want to give the jury a break

22  yet.  We're only going to 1.  I'll take the side bar.

23        (Continued on following page.)

24

25

SIDEBAR CONFERENCE                          793

1           (Sidebar conference.)

2           MR. GOLTZER:  You might want to note the date.

3           THE COURT:  Yes.

4           MR. GOLTZER:  The government has provided us with an

5    exhibit -- we've always had it, it just wasn't noticed as an

6    exhibit that they intended to offer until after the opening

7    statement.  So I assume the government's going to say we

8    opened the door to it.

9           But it's dated April 28th, 2013.  It's a letter to

10   Sterling Johnson well after the sentencing of Mr. Romano and

11   after he was indicted for the conspiracy to murder, with one

12   simple statement:  "The defense for Joseph Romano (pro se)

13   respectfully requests His Honor to rule on setting aside

14   Romano's plea which was allocuted before Judge Bianco February

15   9th, 2012."

16          We object to it, because it is too remote in time,

17   being over a year later, 14 months later.  There's no basis

18   for withdrawing the plea.  And it doesn't change the fact that

19   Mr. Romano, his state of mind at the time we've talked about

20   it, was not to appeal or otherwise contest his plea.

21          THE COURT:  You're objecting?

22          MR. GOLTZER:  Yes.

23          THE COURT:  Overruled.

24          (End of sidebar conference.)

25          (Continued on following page.)

WILLIAM HESSLE-REDIRECT-DEAN                794

1    Q     Mr. Hessle, what is Government Exhibit 42?

2    A     Government 42 is a letter dated April 28, 2013, addressed

3    to the Honorable Sterling Johnson, United States District

4    Court, Eastern District of New York, Brooklyn, New York, from

5    the defendant.

6    Q     And how did you obtain this letter?

7    A     This was -- is actually available on the Pacer system

8    that the gov -- that the court system uses to update cases.

9    Q     And this was filed by the defendant?

10   A     Yes.  According to -- yes.  It was filed, according to

11   the Pacer documentation, on May 2nd, 2013.

12   Q     In which case was this document filed?

13   A     This was filed in the coin case, the case preceding this

14   one.

15         MS. DEAN:  Your Honor, the government offers Exhibit

16   42.

17         MR. GOLTZER:  Objection.

18         THE COURT:  There is an objection.  Your objection

19   is overruled.  Proceed.

20         MS. DEAN:  May we publish?

21         THE COURT:  You may.

22         (Exhibit published to the jury.)

23   Q     Do you see that, Mr. Hessle?

24         THE COURT:  Most respectfully, we have so many

25   screens here, I'm not sure.

1          MR. MARSHALL:  May I approach, Your Honor?

2          THE COURT:  What I'm trying to find out, it shows up

3    on my screen.  Is it on the jury's screens?

4          THE JURORS:  Yes.

5          THE COURT:  All right.  Okay.  Now it's up on the

6    big screen.  As long as the jury sees it, it doesn't make any

7    difference whether it's on the big screen or not.  Okay, 42 is

8    in evidence.  Go ahead.

9    Q    Mr. Hessle, can you start reading from "Your Honor."

10   A    "Your Honor, the defense for Joseph Romano (pro se)

11   respectfully requests His Honor to rule on setting aside

12   Romano's plea which was allocuted before Judge Bianco February

13   9th, 2012."

14   Q    Now, referencing the date of this letter, April 28th,

15   2013, at that time was the defendant in the Nassau County

16   Jail?

17   A    Yes, he was.

18   Q    April 28th, 2013?

19   A    I'm sorry.  No, he was not.  He was actually in MDC.

20   Q    So he was no longer in the Nassau County Jail?

21   A    He was in the Metropolitan Detention Center located in

22   Brooklyn, New York.

23   Q    Now, with regard to setting aside Romano's plea, what

24   does that mean, to set aside a plea?

25   A    Basically, he was trying to say that he --

WILLIAM HESSLE-REDIRECT-DEAN                    796

1          MR. GOLTZER:  Objection.

2          THE COURT:  What he was trying to say would not be

3    admissible.  So that's sustained.  Put your question again.

4    I'll put it.  What does it mean to withdraw a plea?

5    A    He no longer considered -- he no longer wants to say that

6    he's admitting to his guilt.

7          THE COURT:  Okay.

8    Q    Now, you were asked a series of questions about what

9    happened during the defendant's sentencing hearing.  Do you

10   recall those questions?

11   A    Yes.

12   Q    You were also asked whether the defendant requested any

13   particular sentence.

14   A    Yes.

15   Q    Did the defendant request any particular sentence or

16   sentencing range?

17   A    Not that I can recall, no.

18   Q    After the defendant was sentenced to 15 years by Judge

19   Bianco, do you recall any objection taken by the defendant's

20   attorney?

21   A    Not to my recollection, no.

22          MS. DEAN:  Nothing further, Your Honor.

23          THE COURT:  Any recross?

24          MR. GOLTZER:  Very brief.

25   RECROSS-EXAMINATION

WILLIAM HESSLE-RECROSS-GOLTZER                    797

1   BY MR. GOLTZER:

2   Q    Actually, at the sentencing, the attorney asked the judge

3   to give him less than 151 months?

4   A    That may be.  In the transcript -- I don't recall that.

5   I would have to review it.

6   Q    Okay.  Now, Government Exhibit's 42, the letter just

7   shown to you by the government which is in evidence, the date

8   of this particular letter addressed to Sterling Johnson is

9   April 28th, 2013; is that correct?

10  A    Yes.

11  Q    The date upon which Mr. Romano was sentenced was February

12  of 2012?

13  A    Yes.

14  Q    For 14 months, he'd already been serving a 15-year

15  sentence?

16  A    Yes.

17  Q    This letter was written to Judge Johnson after Mr. Romano

18  was indicted in this case, the conspiracy to murder case;

19  isn't that right?

20  A    It would appear so, yes.

21  Q    And there's no reason given in this letter why Mr. Romano

22  wants his plea withdrawn?

23  A    Correct.

24  Q    It's simply a statement asking --

25           THE COURT:  The letter speaks for itself.

WILLIAM HESSLE-RECROSS-GOLTZER                    798

1           MR. GOLTZER:  Thank you, Judge.

2    Q    He pled guilty in 2010?

3    A    Yes.

4           MR. GOLTZER:  Thank you.

5           THE COURT:  Anything else?

6           MR. MARSHALL:  No, Your Honor.

7           THE COURT:  Thank you very much.  You're excused.

8    We'll take our recess now, 15 minutes.  Don't discuss the case

9    or --

10          (Jury exits.)

11          (Recess.)

12          (Jury enters.)

13          THE COURT:  Could all of you be seated except juror

14   number one.

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                           799

1          (Sidebar conference.)

2          THE COURT:  We know you're an airline stewardess.

3    We know -- I should say attendant.  They don't like the word

4    "stewardess."

5          THE JUROR:  We're flight attendants now.

6          THE COURT:  I know that you wanted to know whether

7    you'd be able to fly weekends, and I've discussed it with

8    counsel.  What we suggest is this, and my rule right now is

9    you can fly next weekend, because it's a four-day weekend.

10   After that, if you want to let us know again and we'll tell

11   you as the trial progresses.  Don't try and fly this weekend.

12         THE JUROR:  I will not fly this weekend.

13         THE COURT:  And don't discuss this with any of the

14   other jurors.

15         THE JUROR:  Thank you, Your Honor.

16         (End of sidebar conference.)

17

18

19

20

21

22

23

24

25

PROCEEDINGS                          800

1          THE COURT:  Counsel.  This is on the record.  Stay

2     at the table.  There was a matter I took up with you

3     yesterday.  I just talked to my chambers, and apparently I

4     received a certain communication that I have to discuss with

5     you after we finish today.  So don't leave.  I'll discuss it

6     as soon as physically I have the communication.  I don't

7     physically have it yet.

8          All right.  The next witness, please.

9          MS. DEAN:  Your Honor, the government calls Special

10    Agent Sean McMullen.

11         THE COURT:  And Mr. Ryan reminds me that the jury

12    wanted to know whether they could take notes.  Well, the

13    answer is yes, but, and the but really makes more sense than

14    the yes.  And the reason for the but is this:  I point out

15    each day that we have wonderful court reporters.

16         Today we have Ms. Bryant here.  Every word that is

17    said on the record she takes down, and I get a copy of it and

18    the lawyers get a copy of it every night.  And here's

19    yesterday's testimony.  And if at the end of the case, there's

20    a question about who said what and what the testimony was, we

21    have the record and you can ask for it.

22         I don't think it's a good idea to take notes,

23    because what happens is you start worrying about the notes

24    instead of listening.  You'll have it all there.  But if

25    somebody feels it's absolutely necessary to take notes, I'm

SEAN McMULLEN-DIRECT-DEAN                    801

1    not going to forbid it, but I don't think it's such a good

2    idea.  Okay.

3              You may swear the witness.  I think the witness came

4    in.  Come on up.

5              (Witness sworn.)

6              THE CLERK:  State your full name and spell your last

7    name for the record.

8              THE WITNESS:  Sean C. McMullen, M-c-M-u-l-l-e-n.

9              THE COURT:  You may proceed.

10             MS. DEAN:  Thank you, Your Honor.

11             **SEAN C. McMULLEN,**

12             called by the Government, having been

13             first duly sworn, was examined and testified

14             as follows:

15   DIRECT EXAMINATION

16   BY MS. DEAN:

17   Q    Can you tell the jury who you work for?

18   A    I work for the Federal Bureau of Investigation.

19   Q    And what is your title?

20   A    I'm a special agent.

21   Q    How long have you been a special agent with the FBI?

22   A    In June, it will be 18 years.

23   Q    And what office of the FBI are you assigned to?

24   A    I'm assigned to the Long Island office.

25   Q    Are you assigned to any particular group within that

SEAN McMULLEN-DIRECT-DEAN                    802

1   office?

2   A    Yes.  I'm assigned to the Long Island Gang Task Force.

3   Q    And can you explain what generally your duties and

4   responsibilities are as a special agent with the FBI?

5   A    Yes.  I investigate violent street gangs on Long Island.

6   I also have a collateral duty.  I'm a certified bomb

7   technician, where I'll investigate bombing incidents.

8   Q    Now, just to be clear, are there any FBI agents who are

9   just called agent as opposed to special agent?

10  A    No.  Everybody's a special agent once you graduate the

11  Academy.

12  Q    Now, turning your attention to August 10th, 2012, did you

13  participate in an investigation involving Joseph Romano?

14  A    I did.

15  Q    And do you see Joseph Romano sitting in this courtroom

16  today?

17  A    Yes, I do.

18  Q    Can you identify him by an article of clothing he's

19  wearing?

20  A    He's wearing a gray sweater.

21         MS. DEAN:  Your Honor, if the record could reflect

22  that the witness identified the defendant, Joseph Romano.

23         THE COURT:  The record so reflects.

24  Q    When did you initially become involved in this

25  investigation?

SEAN McMULLEN-DIRECT-DEAN                            803

1    A    That day.  I was informed by the case agent, Reynaldo

2    Tariche.

3    Q    And when you say "that day," are you referring to August

4    10th?

5    A    Yes.

6    Q    Showing you what's been marked for identification as

7    Government Exhibit 13.

8             MS. DEAN:  The defense has no objection to this

9    exhibit, Your Honor.  May we offer it?

10            THE COURT:  Received, if there's no objection.

11   Q    Showing you what's now been admitted as Government

12   Exhibit 13, what is this document?

13   A    It's not on the screen yet.

14            MR. GOLTZER:  You can see it's a calendar, Judge.

15            THE COURT:  Yes, it's a calendar for August 2012,

16   September 2012, October 2012.

17   A    Yes.

18   Q    Thank you.  You said you were -- you said you first

19   became involved in the investigation on October -- August

20   10th, 2012.  How did you become involved?

21   A    I was asked to go to the Federal Courthouse in Central

22   Islip, and if I could bring along some recording equipment.

23   Q    Who asked you to bring some recording equipment to the

24   Federal Courthouse?

25   A    Agent Tariche.

SEAN McMULLEN-DIRECT-DEAN                804

1   Q     And what was the purpose of this request?

2   A     He informed me that they were going to record a meeting

3   between two inmates at the courthouse.

4   Q     Which two inmates?

5   A     Gerry Machacek and the defendant.

6   Q     Had there been a prior meeting between the FBI and Gerald

7   Machacek?

8   A     I was told there was, yes.

9   Q     You were not involved in that meeting?

10  A     I was not.

11  Q     Now, were you heading up the investigation?

12  A     I was not.

13  Q     Who was the lead agent or the case agent on the

14  investigation?

15  A     Agent Tariche.

16  Q     Were you involved in any of the day-to-day

17  decision-making about the investigation?

18  A     No.

19  Q     But you were part of Special Agent Tariche's squad?

20  A     Yes.

21  Q     Can you describe what your role was?  Let me withdraw

22  that.

23          On August 10th, 2012, was the defendant also an

24  inmate at the time?

25  A     Yes, he was.

SEAN McMULLEN-DIRECT-DEAN                          805

1  Q    Did Gerald Machacek agree to meet with the defendant and

2  record him?

3  A    Yes, he did.

4  Q    And what was the purpose of having Machacek meet with and

5  record the defendant?

6          MR. GOLTZER:  Objection; basis of knowledge.

7          THE COURT:  If he knows the purpose, he can tell us

8  the purpose.  Overruled.

9  A    I was told there was a threat against Judge Joseph Bianco

10 and AUSA --

11         THE COURT:  That's not the purpose, sir.  What was

12 the purpose?

13 A    The purpose was to record the meeting.

14         THE COURT:  The first part of the answer is

15 stricken.  Okay.  Go ahead.  The purpose was to record the

16 meeting.  Go ahead.

17 Q    Without testifying as to what anyone told you, what were

18 you having Gerry Machacek record the defendant for?

19         MR. GOLTZER:  Objection.

20         THE COURT:  Overruled.

21 A    He was going to record the defendant to see if there was

22 a threat against Judge Joseph Bianco and AUSA Lara Gatz.

23 Q    And you said that this meeting was to take place at the

24 Central Islip Courthouse?

25 A    Yes, inside the lockups in the marshals' area.  It's a

SEAN McMULLEN-DIRECT-DEAN                806

1    holding area where they keep the prisoners.

2    Q    The holding area where the prisoners stay before a court

3    appearance?

4    A    Yes.

5    Q    Did the defendant have a court appearance that day?

6    A    The defendant did, yes.

7    Q    With who?

8    A    Judge Joseph Bianco.

9    Q    Did Gerald Machacek have a court appearance that day?

10   A    He did not.

11   Q    And so was the intent to make it appear that Gerald

12   Machacek had a court appearance?

13   A    Yes.

14   Q    And what specifically did you do on August 10th of 2012?

15   A    I provided Gerry Machacek a recording device to record

16   the meeting.

17   Q    Can you describe what this recording device looked like?

18   A    It's a small silver box, about two inches by two inches.

19   Q    When you say you provided it to Gerald Machacek, can you

20   describe what you mean by that?

21   A    I told Gerry Machacek where we were going to place it on

22   him.  I told -- gave him instructions not to touch the

23   recording device.  And I turned the device on when he was --

24   went back to the cells.

25   Q    Now, where did this meeting between you and Gerald

SEAN McMULLEN-DIRECT-DEAN                    807

1   Machacek take place?

2   A    It took place outside.  There's a little marshals'

3   office.  In that office.

4   Q    So Mr. Machacek was in a holding pen, and then you

5   removed him to meet with him?

6   A    Yes.  The marshals removed him and brought him to me to

7   put the device on him.

8   Q    Were there any other agents with you when you met with

9   Mr. Machacek?

10  A    Special Agent Tariche.  And I think, if I remember

11  correctly, Investigator Randy Cox was also there.

12  Q    Now, you said that you informed Mr. Machacek as to where

13  you were going to place the recording device.  Where did you

14  place the recording device?

15  A    We placed it in a pocket on his shirt.  Being that the

16  pocket was on the outside, I had him turn the shirt inside out

17  so the pocket was facing on the inside.  And then I placed the

18  recording device inside that pocket.

19  Q    What was the purpose of having him turn his shirt inside

20  out?

21  A    So the defendant wouldn't notice the recording device.

22  Q    Now, you also told Mr. Machacek not to touch the

23  recording device.  Why did you tell him not to touch the

24  recording device?

25  A    I did not want him starting and stopping the device.

SEAN McMULLEN-DIRECT-DEAN                    808

1   Only I could do that.

2   Q    And so when you put the recording device in Mr.

3   Machacek's pocket, it was already turned on?

4   A    Yes.  I turned it on when I put it in his pocket.

5   Q    When you gave him the recording device, did you give him

6   any particular instructions?

7   A    The only instructions I gave him was not to touch the

8   recording device, just act normal and nice and easy.  That's

9   really it.

10  Q    Were you aware of any prior meetings that Machacek had

11  had with the defendant prior to that day, August 10, 2012?

12  A    Yes, I knew there was a meeting.  I don't know how many

13  meetings.

14  Q    And did you give Mr. Machacek any particular instructions

15  with respect to the fact that he had prior meetings with the

16  defendant?

17  A    I did not.

18  Q    Now, did the meeting between Mr. Machacek and the

19  defendant, in fact, take place?

20  A    It did.

21  Q    And approximately how long was the meeting?

22  A    About an hour and a half, hour and 20 minutes.

23  Q    And how did the meeting come to a conclusion?  How did it

24  end?

25  A    We removed Machacek from the cell.  I retrieved the

SEAN McMULLEN-DIRECT-DEAN                    809

1    recording device and deactivated it.

2    Q    Where did that take place?

3    A    That took place outside the holding pens.  There's a

4    door, and they walked him to me.

5    Q    So Mr. Machacek was removed from the holding pen that he

6    was in with the defendant?

7    A    Yes.

8    Q    And brought to you?

9    A    Yes.

10   Q    After you retrieved the recording device from Mr.

11   Machacek, could you tell whether it had been, in fact, turned

12   off or back on by Mr. Machacek?

13   A    Yes, I can.

14   Q    And what did you find?

15   A    It was not turned on and off.  I was the only one that

16   turned it on and off.

17   Q    How did you know that?

18   A    Because when you go to download it, there would be more

19   than one entries.  You'd see the machine go off and then

20   restart on and then be off again.  So there's only two

21   entries, on and off.

22   Q    Now, did that recording device capture just sound or was

23   there video, too?

24   A    That recording device just captured sound.

25   Q    And after you downloaded the recording, did you listen to

SEAN McMULLEN-DIRECT-DEAN                    810

1    it?

2    A    I did.

3    Q    Now, the recording device captured only sound.  Was there

4    any video of the meeting that took place between Mr. Machacek

5    and the defendant?

6    A    Yes.  The cells have a video camera in them.  They don't

7    capture audio, they just capture video.

8    Q    Now, I'm showing you what's been marked Government

9    Exhibit 201A for identification.  Do you recognize Government

10   Exhibit 201A?

11   A    It's not up on the screen yet.

12            MS. DEAN:  May I approach the witness, Your Honor?

13            THE COURT:  Yes, you may.

14            MS. DEAN:  This is for identification only, so I'll

15   approach the witness.

16   Q    What is Government Exhibit 201A?

17   A    This is the audio, copy of the audio recording of the

18   meeting on August 10.

19   Q    And how do you recognize that as being the audio

20   recording?

21   A    My initials on it.

22            MS. DEAN:  Your Honor, the government offers Exhibit

23   201A.

24            MR. GOLTZER:  No objection.

25            THE COURT:  Received.

SEAN McMULLEN-DIRECT-DEAN                    811

1    Q     And showing you --

2               MS. DEAN:  May I approach again, Your Honor?

3               THE COURT:  Yes.

4    Q     Showing you what's been already admitted into evidence as

5    Government Exhibit 201B.  Do you recognize Government Exhibit

6    201B?

7    A     Yes.

8    Q     What is it?

9    A     This is the video of August 10th of the cells.

10              MS. DEAN:  And finally, may I approach again, Your

11   Honor?

12              THE COURT:  Yes.

13   Q     Showing you what's been marked as Government Exhibit

14   201 -- actually, can you just hold onto that for a moment.

15              Showing you what's been marked Government 201T, do

16   you recognize this document?

17   A     Yes, I do.

18   Q     What is it?

19   A     This is a transcript of the audio recording.

20   Q     And did you review this transcript prior to today?

21   A     I did.

22   Q     And is it a fair and accurate transcription of the

23   recording?

24   A     It is.

25   Q     And what is Government Exhibit 201?

SEAN McMULLEN-DIRECT-DEAN                    812

1    A    This is a -- where we married the video and the audio

2    together and then subtitled it.

3    Q    And you reviewed Government Exhibit 201 prior to today?

4    A    I did.

5    Q    And is it a fair and accurate marriage of the audio

6    recording and the video recording?

7    A    Yes.

8            MS. DEAN:  Your Honor, at this time, the government

9    offers Government Exhibit 201.

10           MR. GOLTZER:  No objection, with the exception that

11   the subtitles are an aid, not evidence.

12           MS. DEAN:  Yes, Your Honor.

13           THE COURT:  Received, with that instruction.

14   Q    When did you last review these exhibits, Government

15   Exhibit 201, 201A and 201B?

16   A    Within the last week.

17   Q    And prior to that, when had you last reviewed the audio

18   recording from that meeting?

19   A    On August 10th.

20           MS. DEAN:  Your Honor, at this time we would like to

21   play Government Exhibit 201, but we request an instruction

22   with regard to the statements of Mr. Machacek.

23           THE COURT:  All right.  Before you do it, first of

24   all, do I have 201?  I've got all these books here.  I can't

25   find 201.

SEAN McMULLEN–DIRECT–DEAN                    813

1          If there's a further desire for an instruction after

2     I do it, I have to get some notes that I left in the robing

3     room, because I wasn't aware that this was where we were

4     getting to that.  In fact, let me just get the notes so

5     that -- I have the instruction for you all written out, but I

6     don't have it in here.

7          (Pause.)

8          MS. DEAN:  Your Honor, if it would be appropriate at

9     this time to just let the jurors know that the sound will come

10    through the speakers overhead, but they can also listen on

11    their headphones if they turn on the power button.

12         THE COURT:  Yes, they certainly may.  And also, when

13    you get the transcript, again, it's what you hear that is

14    evidence, not what is on 201T.  Okay?

15         Okay.  As I understand it, we're about to hear a

16    recording in which this fellow, Gerald Machacek, was a

17    participant.  Nothing said by Mr. Machacek on the recordings

18    is to be considered by you as true.  Only the statements made

19    by the defendant, Mr. Romano, are to be considered for their

20    truth.  The statements of Mr. Machacek or any other

21    unidentified voice on the tape or on the disc are going to be

22    simply admitted to provide you with a context in which to

23    evaluate any statements by the defendant that you may have

24    heard.

25         Since at this point, Machacek has not been called as

SEAN McMULLEN-DIRECT-DEAN                814

1   a witness and since his statements are not admitted for their

2   truth, you don't have to evaluate, certainly not at this

3   point, his credibility or believability the way you have to

4   evaluate the testimony of witnesses who are on the stand here

5   before you.

6           None of Mr. Machacek's statements are being offered

7   for the truth of the statement that he allegedly made.  All

8   right.

9           MS. DEAN:  Your Honor, this video is rather lengthy.

10  May I sit down while it's playing?

11          THE COURT:  Sure, you may.

12          (Video recording played.)

13  Q    Special Agent McMullen, what is the purpose of your

14  giving this preamble at the beginning of this recording?

15  A    It gives us the date when the recording occurred.  And

16  then when you see test-test-test, there's a little light on

17  the recording.  So I just make sure the recording is

18  operative.

19          (Video recording played.)

20          THE COURT:  All right.  That completes the tape.

21  That completes our work in front of the jury this week.  Have

22  a very nice weekend, everybody.  I promised you I'd let you

23  go.  I wanted to finish the tape.  That's the only reason we

24  stayed this late.  Thank you very much.

25          (Jury exits.)

SIDEBAR CONFERENCE                    815

1              THE COURT:  Counsel, can I see you at sidebar with

2    the court reporter.

3              (Sidebar conference.)

4              THE COURT:  I received this letter from counsel for

5    Newsday apparently in my chambers in New York.  It was faxed

6    over here.  I just learned about it after the morning recess.

7    I've read it.  It seems to me we ought to make everything

8    available and not start fighting peripheral battles.  You read

9    it.  I'll be right back.  And we'll take it at the sidebar.

10             (Pause.)

11             THE COURT:  Has everyone had a chance to read the

12   letter?

13             MR. MARSHALL:  I've read through quickly, Your

14   Honor.

15             THE COURT:  Yes.

16             MR. GOLTZER:  I'm familiar with their position.

17             MR. MARSHALL:  As am I.

18             THE COURT:  It seems to me that it's a silly fight

19   to fight.

20             MR. GOLTZER:  Let me tell Your Honor our concern.

21   It's a matter of timing.  I'm concerned about the impact that

22   Machacek being on television will have on Machacek when we try

23   to call him as a witness.  That's my concern.

24             THE COURT:  How do you know -- this has nothing to

25   do with telling -- this is a letter from Newsday, which is a

SIDEBAR CONFERENCE                              816

1    newspaper, and they want to see the exhibits.  The exhibits

2    are public.

3            MR. GOLTZER:  I have no problem with them looking at

4    the exhibits, but I don't want them to take a copy of the

5    exhibit and give it to the TV media, so that Machacek ends up

6    on Channel 7 News and says, I'm not coming in and I'm not

7    talking to these SOBs and they kill me, you know.  That's my

8    concern, Judge.

9            MR. MARSHALL:  Your Honor, we address these types of

10   motions frequently.

11           THE COURT:  I know.

12           MR. MARSHALL:  And it's generally our position, as

13   it is here today, that the press does have a qualified First

14   Amendment right to these documents unless there's something

15   that overrides that.  And as of what I've heard so far,

16   there's nothing, in the government's view, that overrides

17   their qualified First Amendment right in this case.  I would

18   tell you -- for this piece of evidence, I mean.

19           I would tell you, Your Honor, our position might be

20   different with respect to when the undercover agent's face is

21   on the video, that there may be some -- our position may

22   change with respect to that, because that could put his safety

23   at risk, which might be a right that would override the

24   qualified First Amendment right.

25           THE COURT:  Let me ask you this:  The defense, Mr.

SIDEBAR CONFERENCE                    817

1   Goltzer, would you have any objection to them hearing the

2   tape?

3              MR. GOLTZER:  No.

4              THE COURT:  Okay.  So --

5              MR. GOLTZER:  Because his name's not mentioned in

6   that part of the tape.

7              THE COURT:  Let's let them hear the tape.

8              MR. MARSHALL:  Yes.

9              THE COURT:  And see the transcripts.

10             MR. MARSHALL:  Yes.

11             THE COURT:  And make the tapes, the audio part of

12  the tapes available.

13             MR. MARSHALL:  Yes.

14             THE COURT:  Okay.

15             MR. GOLTZER:  And I think --

16             MR. MARSHALL:  We have no objection to that.

17             MR. GOLTZER:  I think there's a qualified -- I think

18  there's a principle basis to underscore the word "qualified,"

19  because of our concern about our witness, and I appreciate the

20  ruling.

21             THE COURT:  I'm attempting --

22             MR. GOLTZER:  I know you are.

23             THE COURT:  -- to resolve this without a lot of

24  unnecessary satellite litigation.

25             MR. MARSHALL:  Yes.

SIDEBAR CONFERENCE                      818

1              THE COURT:  Which I don't want.

2              MR. GOLTZER:  We don't either, and that's why we

3      agree with the Court's Solomonic solution.  The word

4      "Solomonic" is making them smile, Judge.

5              THE COURT:  So you can tell anybody in the press

6      here that they can listen to the tape if they want to hear the

7      tape.  If copies are available, you can give them copies.

8              MR. MARSHALL:  Yes, Your Honor.

9              THE COURT:  I will memo-endorse this and file it.

10             MR. MARSHALL:  Yes, Your Honor.

11             THE COURT:  But I'm going to accept the video

12     portion.  That's all.

13             MR. MARSHALL:  Yes, Your Honor.

14             THE COURT:  Okay.

15             MR. MARSHALL:  Actually, Your Honor, just for the

16     record, we actually did introduce the audio record as a

17     separate exhibit from the video record, so it should be fairly

18     easy to do.

19             THE COURT:  Okay.  Fine.  Thank you.  I remember

20     that.

21             MR. GOLTZER:  Have a good weekend, Judge.

22             THE COURT:  You, too.

23             (End of sidebar conference.)

24             (Matter adjourned until January 13, 2014, at 10:00

25     a.m.)

819

I N D E X

WITNESS

| FOR GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

William Hessle
    By Ms. Dean:     733           789
    By Mr. Goltzer:       752
Sean C. McMullen
    By Ms. Dean:     801

EXHIBIT

| EXHIBIT NUMBER | PAGE |
|---|---|
| Government Exhibit 300A | 734 |
| Government Exhibit 99 | 739 |
| Government Exhibit 95 | 742 |
| Government Exhibit 96 through 98 | 742 |
| Government Exhibit 40, 41A through 41E | 745 |
| Government Exhibit 42 | 794 |
| Government Exhibit 13 | 803 |
| Government Exhibit 201A | 810 |
| Government Exhibit 201 | 812 |