**U.S. Department of Justice**

*United States Attorney*
*Western District of New York*

PT:UAD
F.#2012R1316

September 23, 2014

VIA ECF and Regular Mail

The Honorable John F. Keenan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re: United States v. Joseph Romano
Criminal Docket No. 12-691 (JFK)

Dear Judge Keenan:

The government respectfully submits this reply to the defendant's September 22, 2014 opposition to the government's motion seeking the return of all Trial Discovery materials, as defined in the December 18, 2013 Protective Order (the "Protective Order"), that is currently in the defendant's possession, custody or control. While admitting in his opposition brief that he breached the plain terms of the Protective Order, (Defendant's Opposition Br. ("Def.'s Br."), dated September 22, 2014, at 1), the defendant argues that the breach amounts to a mere technicality because "the entirety of the document's content was the subject of extensive trial testimony." Id. The defendant is wrong.

A. The Defendant Should Be Held to the Plain Terms of the Protective Order

At the outset, it should be noted that the Protective Order was the product of extensive negotiation between the government and the defendant, through his attorneys, and the defendant should be held to its terms. It was instituted because of the danger posed by allowing the defendant – who has an extensive history of violence, witness tampering and obstruction of justice – unrestricted access to sensitive material regarding the government's witnesses. At no point during the negotiations did the defendant seek to include language in the Protective Order allowing for dissemination of Trial Discovery at the conclusion of trial or where the general content of a witness's Trial Discovery became public.[1] The defendant, through his counsel,

[1] In fact, the government initially contemplated requiring the return of all Trial Discovery material immediately after trial. Defense counsel took the position that they would need the material for the duration of any appeal as well as for post-conviction relief. The parties

agreed to the negotiated terms of the Protective Order and should not now be allowed to argue that his violation of its terms should be overlooked as a technicality.

B. The Trial Discovery Remains Confidential

The defendant is wrong in arguing that the Trial Discovery disseminated by the defendant is no longer confidential in nature. While the general content of the Trial Discovery at issue was discussed at trial and reported on by the press, there is a clear qualitative difference between wading through hundreds of pages of trial transcripts to gather information (or reading a third hand account of trial testimony in a newspaper) and having in one's hand a single document in a cooperating witness's handwriting outlining exactly what information the witness provided to law enforcement. An individual who wishes to retaliate against a cooperating witness is much more likely to succeed in recruiting others to help him by showing people a succinct letter written by the cooperating witness rather than pages upon pages of trial transcripts or a summary of testimony from a newspaper clipping. The letter simply serves as better "proof." This difference presumably is why the defendant sent the actual letter to his wife rather than the trial testimony or newspaper articles. If, as the defendant argues, trial transcripts, newspaper clippings and Trial Discovery documents are one and the same, the defendant could have achieved whatever his purpose was by sending these other documents to his wife, which would have not resulted in a breach of a court order, rather than the actual Trial Discovery.

To this end, the defendant has yet to explain his reason for disseminating the Trial Discovery. In arguing that his violation amounts to "a purely technical violation" undeserving of sanctions (Def.'s Br. at 3), he essentially asks the Court to assume he breached the Protective Order for a proper purpose. The defendant is not deserving of such latitude, particularly given his history of violence, flouting court orders, tampering with witnesses and obstructing justice.

C. The Circumstances Surrounding the Breach Suggest an Improper Motive

The circumstances surrounding the breach of the Protective Order, as well as the government's investigation, further suggest improper motives on the part of the defendant. The Protective Order includes procedures available to the defendant should he or his counsel deem it necessary to disclose Trial Discovery materials to individuals not otherwise authorized to receive the materials. Specifically, paragraph 3 of the Protective Order provides that defense counsel must notify the government and make an application to the Court to make such a disclosure. The defendant did not follow these procedures, but simply sent a copy of Trial Discovery material to his wife without notification to or permission from his own counsel, the government or the Court.

Moreover, the defendant sent the letter to his wife not at her home, where he typically sends her mail, but to her clothing store "Karma Boutique." Additionally, the letter did not contain any instructions as to what to do with the Trial Discovery, suggesting that the defendant provided his wife with instructions at some other point in time. Indeed, during the

---

ultimately agreed that the defense would be permitted to retain Trial Discovery until the conclusion of any appeal, and that the Protective Order would govern until that time.

course of his murder conspiracy, for which the defendant is serving two life sentences, the defendant typically gave instructions to his coconspirator Dejvid Mirkovic in person during jail visits.

To this end, the government has uncovered evidence that the defendant is in fact providing such information to his wife during jail visits. During an August 1, 2014 telephone call from the defendant to his wife, the defendant stated that he would be leaving the Metropolitan Detention Center ("MDC") shortly for his designated prison facility and said, "I'm just telling you right now, when you come in Wednesday . . . we need to have a serious talk about something things that I need to get done here, ok? Because I'm gonna tell you right now, I have been fucking wrongfully accused."[2] The defendant's wife interrupted and said that she did not want to talk on the telephone. Romano continued, "I am not fucking gonna be abused like this by criminals that fucking work in these facilities . . . . And you are gonna fucking follow the instructions that I tell you." The defendant's wife repeated that she did not want to discuss the matter on the telephone, at which point the defendant instructed her to tell his friend "Renee" to bring "that guy Vinny" to visit him in jail the following Thursday.[3]

The government has not established that this call in fact related to the dissemination of Trial Discovery to the defendant's wife. However, it is clear at a minimum that the defendant continues to plot from within jail with his wife's assistance. Given this fact, the circumstances of the instant breach, and the defendant's history of violent behavior, retaliation against perceived enemies and witness tampering, he is not entitled to an assumption that he breached the Protective Order for anything other than a nefarious purpose.[4] In the instant case, the defendant plotted to murder and mutilate a federal judge and a federal prosecutor because he blamed them for his prosecution and sentencing for coin telemarketing fraud. It is not a stretch to imagine that he may be plotting to retaliate similarly against the cooperating witness who alerted the government to the murder plot and that he sent the Trial Discovery to his wife to further this objective.

---

[2] The government is prepared to provide the Court with a copy of this recorded telephone call should the Court deem it necessary.

[3] Based on the government's investigation, "Renee" is a friend of the defendant. The government has not identified "Vinny."

[4] As another example, the defendant received a letter at the MDC, dated August 18, 2014, from someone in Orlando, Florida with last name "Ramirez," who wrote that he was sending along a message from an inmate named "Jose Diaz." Ramirez also referred to this person as "Rufino." According to Ramirez, Rufino had spent time with Romano in the MDC. Ramirez wrote, ""He hasn't done what promised [sic] because he needs $20,000 and is [sic] so hard to do anything yet (he is still in the S.H.U.) and many ugly things are happening with his lawyer." This letter indicates that Romano continues to plot and has recruited yet another inmate to do his bidding. A copy of this letter is attached hereto as Exhibit A.

D. Return of All Hard and Electronic Copies of Trial Discovery is the Appropriate Remedy

Given the instant breach, the appropriate remedy is the return to the government of all Trial Discovery material in the possession, custody and control of the defendant, as contemplated by the Protective Order. The defendant's alternative proposal to return to the government hard copies of Trial Discovery but permit the defendant to retain electronic copies of Trial Discovery is not sufficient to militate against the threat of further dissemination. While inmates are indeed not permitted to print electronic materials within jail, the defendant can easily mail the CD to someone[5] or pass it off to another inmate.[6] The remedy sought by the government, given the serious nature of the breach, is reasonable and will not cause undue prejudice to the defendant, since he is represented by counsel, who will have access to the Trial Discovery for the purposes of appeal.

* * *

In short, the danger created by the defendant's breach of the Protective Order and the likelihood that the defendant will continue to violate its terms calls for the immediate return to the government all Trial Discovery currently in the defendant's possession, custody or control.

---

[5] In fact, in a recent case handled by the undersigned, the government discovered that a defendant mailed a CD containing 3500 material to his family member, who then posted the material on the internet. The package had not been inspected by the jail officials because the defendant had marked it "Legal Mail."

[6] The instant breach also begs the question of whether the defendant has shared Trial Discovery material with other inmates inside the jail. It is common knowledge that inmates often try and retaliate against cooperating witnesses by passing around documents, such as Trial Discovery material, to other inmates in order to incite violence against cooperating witnesses. See United States v. Palmer, No. 10 Cr. 910, 2011 WL 672412, at *1 (S.D.N.Y. February 14, 2011) (JSR) ("As the Government accurately states, [3500] material . . . is often copied, 'passed around prisons throughout the country,' and used to retaliate against cooperators. The dissemination of 3500 material is a danger not only to incarcerated witnesses, but also to non-incarcerated witnesses and witnesses' family members.").

Anything short of this remedy will only not only put the government's witnesses at risk but also will embolden others to flout similar court orders on the premise that they can do so with impunity.

Respectfully submitted,

ERIC H. HOLDER, JR.
Attorney General of the United States
WILLIAM J. HOCHUL, JR.
United States Attorney

By: /s/ ______________________________
Una A. Dean
Assistant U.S. Attorney
(718) 254-6473

cc: Clerk of Court (JFK) (via ECF)
Daniel Nooter, Esq. (via email)